UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 MAR 30 AM 11: 51

CLERK
BY_____
DEPUTY CLERK

RETAIL PIPELINE, LLC and          )
DARRYL LANDVATER,                 )
                                  )
        Plaintiffs,               )
                                  )
            v.                    )          Case No. 2:17-cv-00067
                                  )
JDA SOFTWARE GROUP, INC.,         )
                                  )
        Defendant.                )

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION
(Doc. 4)

Plaintiffs Retail Pipeline, LLC and Darryl Landvater (collectively, "Plaintiffs") bring this action alleging breach of contract, breach of the implied covenant of good faith and fair dealing, breach of a contract implied in law or fact, and constructive fraud against Defendant JDA Software Group, Inc.[1] Pending before the court is Defendant's motion to dismiss Plaintiffs' claims for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). (Doc. 4.)

On July 13, 2017, the court heard oral argument on Defendant's motion to dismiss and Plaintiffs' request for jurisdictional discovery. The court ruled on the record that it would defer adjudication of the motion until limited jurisdictional discovery was completed. Thereafter, the parties engaged in discovery and filed supplemental memoranda based thereon. Their filings were completed on March 2, 2018, whereupon the court took the pending motion to dismiss under advisement.

---

[1] Defendant represents that Plaintiffs have incorrectly named JDA Software Group, Inc. as a defendant in this matter. Assuming that this representation is accurate, Plaintiffs are granted leave to amend their Complaint to name JDA Software, Inc. as the proper defendant.

Plaintiffs are represented by Marc B. Heath, Esq., Tristram J. Coffin, Esq., and Jennifer E. McDonald, Esq. Defendant is represented by Karen McAndrew, Esq. and Justin B. Barnard, Esq.

## I.    Factual Background.

The facts are derived from Plaintiffs' Complaint, as well as the affidavits and documents submitted by the parties in relation to the pending motion.[2]  Plaintiff Retail Pipeline is a Vermont limited liability company with its principal place of business in Essex Junction, Vermont.  Plaintiff Landvater is a Vermont resident who formed Plaintiff Retail Pipeline with Andre Martin, a Canadian citizen and resident of Montreal, Quebec. Although Mr. Martin served as the company's chairman, *see* Doc. 5-1 at 14, the terms of Plaintiff Landvater's ownership of or employment by Plaintiff Retail Pipeline are not clear.

Defendant is incorporated in Delaware and has a principal place of business in Scottsdale, Arizona.  It is engaged in the business of developing and selling software products for supply chain management.  It has no employees and owns JDA Software, Inc.

In 1997, Plaintiff Landvater and Andre Martin formed and served as the principals of Retail Pipeline Integration Group, Inc. ("RPIG") for the purpose of developing and distributing Flowcasting Technology ("Flowcasting"), a software product that provides time-phased requirement planning for both retail stores and distribution centers so that those entities may forecast and satisfy their distributional needs.  According to Plaintiff Landvater's declaration, "Flowcasting was developed entirely in Vermont." (Doc. 12-1 at 1, ¶ 5.)  On June 30, 2009, RPIG transferred all right, title, and interest in Flowcasting to Plaintiff Retail Pipeline.

---

[2] In analyzing a motion to dismiss for lack of personal jurisdiction, the court considers the allegations in the Complaint as well as the parties' factual submissions.  *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (holding that the court may "consider[] materials outside the pleadings[] . . . without converting a motion to dismiss for lack of personal jurisdiction into a motion for summary judgment").

## A. The Parties' Membership Interest Purchase Agreement.

On July 2, 2009, Plaintiff Retail Pipeline entered into an Intellectual Property Contribution and Assignment Agreement ("IPCAA") with RedPrairie Collaborative Flowcasting Group, LLC (the "Joint Venture"), a Delaware limited liability company. The other member of the Joint Venture was RedPrairie Corporation, a Delaware corporation with its principal place of business in Georgia. Plaintiffs' Complaint is silent as to where the IPCAA was negotiated, signed, and implemented.

Pursuant to the IPCAA, Plaintiff Retail Pipeline contributed certain intellectual property rights in Flowcasting in exchange for a 50% ownership interest in the Joint Venture. Through a Call Option in the Joint Venture Operating Agreement, RedPrairie Corporation retained the right to purchase Plaintiff Retail Pipeline's 50% membership interest for $10 million. As part of the IPCAA, the Joint Venture secured three major clients to use the Flowcasting software: (1) Kraft Foods; (2) Sony Canada; and (3) Sigma Alimentos. Plaintiffs' Complaint does not specify whether any of these entities had any connection to Vermont or conducted any business in Vermont. The Joint Venture reached a tentative deal with a fourth major client, Walmart, which, if completed, would have been a "breakthrough implementation of Flowcasting[]" and would have brought in $84 million in revenue over three years. (Doc. 9 at 4, ¶ 20.)

While negotiations with Walmart were underway, RedPrairie Corporation and Defendant entered into a merger on December 4, 2012 whereby Defendant succeeded to RedPrairie Corporation's position as a 50% member in the Joint Venture. The merger occurred without notice to Plaintiffs, but, according to Plaintiffs, "had the potential to be a very positive development for the Joint Venture[,]" as Defendant was "an even larger, more established software company, with prominence in the supply chain planning software business." *Id.* at 4, ¶ 24. At the time of the merger, Defendant distributed its own software that forecasted the inventory requirements for distribution centers which was marketed as "Demand/Fulfillment." After the Defendant-RedPrairie Corporation merger, Defendant allegedly "refused to sell Flowcasting and attempted to sell potential

3

customers of the Joint Venture on [Defendant's] own Demand/Fulfillment, a lower-grade [distribution center]-level supply-chain software product." *Id.* at 5, ¶ 31.

Shortly after the merger, on February 12, 2013, Defendant's then-CEO Hamish Brewer met with Plaintiff Landvater and Mr. Martin at an unidentified location. Mr. Brewer proposed that they dissolve the Joint Venture and replace it with a new agreement between Defendant and Plaintiff Retail Pipeline. Pursuant to the new agreement, the parties agreed to integrate Flowcasting with Demand/Fulfillment. Plaintiffs represent that, at the time, because Defendant refused to sell Flowcasting they "had no choice but to agree to Mr. Brewer's plan and enter into a new agreement with [Defendant]." (Doc. 51-1 at 4, ¶ 25.) In an email dated February 13, 2013, Mr. Brewer directed Defendant's personnel to work with Plaintiff Landvater and Mr. Martin to develop specific plans to create a product branded "'JDA Flowcasting' to leverage the Flowcasting brand and integrate Flowcasting with Demand/Fulfillment to provide maximum value to [Defendant]'s customers." (Doc. 9 at 5, ¶ 29.) Plaintiffs allege, and Defendant does not contest, that when Defendant proposed dissolving the Joint Venture and entering into a new agreement with Plaintiff Retail Pipeline, Defendant was "fully aware that [Plaintiff] Retail Pipeline was a Vermont company and that [Plaintiff] Landvater was a resident of Vermont[.]" (Doc. 51-1 at 5, ¶ 27.)

On April 3, 2013, again at an unidentified location, Mr. Brewer met with Plaintiff Landvater and Mr. Martin to review a jointly-developed business plan. At the meeting, Mr. Brewer confirmed that "he wanted to dissolve the Joint Venture," pay $3 million to Plaintiff Retail Pipeline "up front," and pay an additional $7 million based on "future revenues of the new, integrated product offering." (Doc. 9 at 5, ¶ 30.) In an email dated July 17, 2013, Mr. Brewer informed Plaintiff Landvater and Mr. Martin that rather than retain Flowcasting as a long-term, stand-alone product, Defendant wanted to integrate Flowcasting into Demand/Fulfillment with a single code base. Defendant offered Plaintiffs a five-year earn-out whereby they would have had one year to integrate Flowcasting into Defendant's current software and four years to earn the purchase price for Plaintiff Retail Pipeline's membership interest in the IPCAA.

4

On December 16, 2013, Plaintiff Landvater and Mr. Martin met with Defendant's executives, including Dan Groneck, Vice President of Defendant's Product Management Group, to agree on the necessary steps to develop "Flowcasting 2.0," a single system integrating Flowcasting and Demand/Fulfillment. *Id.* at 6, ¶ 34 (internal quotation marks omitted). Plaintiffs' Complaint does not state where this meeting took place. Following the meeting, Mr. Groneck circulated an email to the meeting attendees, including Plaintiff Landvater and Mr. Martin. The email contains Mr. Groneck's notes on the plan for developing "Flowcasting 2.0" and outlines the changes to which Defendant would commit in order to integrate Demand/Fulfillment with Flowcasting.

On February 25, 2014, Plaintiff Retail Pipeline and Defendant entered into the Membership Interest Purchase Agreement ("MIPA"), which was signed by Plaintiff Landvater and Mr. Martin on Plaintiff Retail Pipeline's behalf. Downs Rachlin Martin PLLC, a law firm with offices in Vermont, represented Plaintiffs and Mr. Martin in the negotiations which occurred in-person in Scottsdale, Arizona and by telephone. During the negotiations, Plaintiff Landvater communicated with Defendant "virtually on a daily basis from [his] home office in Vermont[]" through emails and telephone conference calls. (Doc. 12-1 at 2.) Plaintiff Landvater and Mr. Martin signed the MIPA and related documents in Vermont. Defendant signed the MIPA in Arizona.

Pursuant to the MIPA, Defendant acquired Plaintiff Retail Pipeline's 50% interest in the Joint Venture and received all right, title, and interest in and to the intellectual property of the Joint Venture, including, without limitation, the Flowcasting software. Defendant agreed to pay Plaintiff Retail Pipeline an aggregate amount of $3 million in three equal installments and up to an additional aggregate amount of $7 million based on certain performance criteria outlined in the MIPA. The sum of $3 million was payable in-full to Plaintiff Retail Pipeline within 270 days of the MIPA signing, whereas the sum of $7 million was an earn-out payment based upon three separate revenue streams: (i) Flowcasting 1.0 and Flowcasting 2.0; (ii) Plaintiff Retail Pipeline's Slow Mover module; and (iii) software license revenue in excess of the first $15 million from sales of Defendant's Demand/Fulfillment to retail customers. The MIPA set an outside date for

5

payment on the earn-out of December 31, 2018. The MIPA does not contain a forum selection clause, however, it provides that the agreement will be governed by, and construed in accordance with, the laws of the State of Delaware, regardless of the law that might otherwise govern under applicable conflict of laws principles.

The MIPA further provides that Plaintiff Landvater and Mr. Martin's employment with Defendant was a condition to Plaintiff Retail Pipeline's right to receive the full value of the earn-out payment. The relevant provision states that unless Plaintiff Landvater or Mr. Martin was terminated "without Cause[,]" "Resign[ed] for Good Reason[,]" died, became disabled and unable to work on or prior to the last day of Defendant's fiscal year on which the annual earn-out payment is based, or "if [Mr.] Martin or [Plaintiff] Landvater is not employed by [Defendant] or one of its Affiliates . . . on the last day of [Defendant's] fiscal year on which the Annual Earn-Out Payment is based[,]" then:

> any Annual Earn-Out Payment, any payment pursuant to [the Acceleration of the Earn-Out clause] and the Maximum Amount of the earn-out portion of the Purchase Price shall be reduced by fifty-five percent (55%) *if [Plaintiff] Landvater ceases to be employed* or thirty-five percent (35%) if [Mr.] Martin ceases to be employed under such circumstances. The ineligibility of one of [Mr.] Martin or [Plaintiff] Landvater to receive an Annual Earn-Out Payment or payment pursuant to [the Acceleration of the Earn-Out clause] shall not preclude [Plaintiff] Retail [Pipeline] from receiving an Annual Earn-Out Payment for such year (or payment pursuant to [the Acceleration of the Earn-Out clause]). However, [Plaintiff] Retail [Pipeline] shall be precluded from receiving an Annual Earn-Out Payment or payment pursuant to [the Acceleration of the Earn-Out clause] if both [Mr.] Martin and [Plaintiff] Landvater are ineligible to receive an Annual Earn-Out Payment or payment under [the Acceleration of the Earn-Out clause] pursuant to this Section[.]

(Doc. 5-1 at 5-6, § 1.3.3(d)) (emphasis supplied).

The MIPA did not require Plaintiff Landvater's employment obligations to be performed in or from Vermont. Correspondingly, it did not require them to be performed in or from an alternative location.

6

## B.    Plaintiff Landvater's Employment with Defendant.

On March 21, 2014, Plaintiff Landvater accepted an offer of employment from Defendant to work as the Senior Product Director in the company's Product Management Group. Defendant hired Plaintiff Landvater as a "full-time" employee with an annual salary, however, as Defendant points out, its written offer of employment letter from Defendant does not mandate a specific hourly requirement for Plaintiff Landvater's employment, but rather states that he will devote his "full time, attention and efforts to the performance of [his] duties as [Defendant] may establish from time to time." (Doc. 52-3 at 3.) According to the terms of Plaintiff Landvater's employment agreement, Arizona law governed any legal proceedings arising out of or related to the agreement, and any legal action was required to be brought "exclusively in the federal or state courts located in the State of Arizona." *Id.* at 6.

In his declaration, Plaintiff Landvater avers that Defendant's primary purpose for hiring him and Mr. Martin was to facilitate the agreed-upon changes required for integrating Flowcasting and Demand/Fulfillment in accordance with the MIPA. Plaintiff Landvater further avers that his earn-out "was based on developing the store-level market." (Doc. 25-1 at 3, ¶ 11.) According to David Johnston, Defendant's Senior Vice President for Global Solutions Strategy, Plaintiff Landvater was hired to provide support and maintenance to a "handful of customers using the Flowcasting software and to provide support to [Defendant's] employees in development of [Defendant]'s software suite." (Doc. 4-1 at 6, ¶ 23.)

As an employee of Defendant, Plaintiff Landvater worked from an office located at 85 Allen Martin Drive, Essex Junction, Vermont, as well as from a home office located in Williston, Vermont. In his affidavit, John Savari, Group Vice President of Technology for Defendant, states that Defendant preferred "that [Plaintiff Landvater] work from one of [Defendant's] office locations, none of which is in Vermont[,]" but he was allowed to work from Vermont because "most of [his] work could be completed remotely[.]" (Doc. 29-1 at 2, ¶ 6.) At no point did Defendant request or require that Plaintiff Landvater work out of one of Defendant's office locations outside of Vermont. When Plaintiff

Landvater met with Defendant, "those meetings were held over the phone or in Arizona, Maryland, Texas, Georgia, and/or Wisconsin." (Doc. 4-1 at 6, ¶ 25.) As part of his employment, Plaintiff Landvater traveled to Defendant's offices in Rockville, Maryland; Montreal, Quebec; Scottsdale, Arizona; Bentonville, Arkansas; and other locations. Defendant reimbursed Plaintiff Landvater for work-related travel to and from Vermont. Defendant's employees did not travel to Vermont "to speak with [Plaintiff] Landvater or to check-in on him about the customers he was handling." *Id.*

With regard to Plaintiff Landvater's Essex Junction office, the parties dispute whether Defendant had a "Vermont office," and, specifically, whether Defendant owed Plaintiff Landvater reimbursement for office rent. In an email from Plaintiff Landvater to Fred Baumann, an employee for Defendant, Plaintiff Landvater stated that he "owned" the Essex Junction, Vermont office. (Doc. 52-4 at 2.) At the time Defendant succeeded to RedPrairie Corporation's position in the Joint Venture, RedPrairie Corporation had been paying rent for the Essex Junction office at the rate of $1,200 per month. On February 19, 2014, less than a week before the parties signed the MIPA, Mr. Baumann sent Plaintiff Landvater a "Whiteboard PowerPoint" presentation that Defendant "used . . . for calculation of the 2014 budget expense items for the Flowcasting P&L." (Doc. 51-1 at 8, ¶ 48) (internal quotation marks omitted). The presentation was marked "draft" (Doc. 52-5 at 4), and included a budget line-item expense for rent for the Essex Junction office and the notation "[b]udget to continue through 2014." (Doc. 52-5 at 4) (internal quotation marks omitted).[3]

It is undisputed that Defendant never paid or reimbursed Plaintiff Landvater for the Essex Junction office, nor did it enter into a lease or otherwise formalize an arrangement to pay for a remote workspace. According to an email sent from Mr. Baumann to Plaintiff Landvater on December 16, 2015, Defendant had a policy to "not

---

[3] Mr. Baumann's notes from a December 21, 2015 conference call listed as a question: "Does the existence of a draft white board provide implicit approval [to pay rent for the Essex Junction office space]?" (Doc. 52-5 at 3.) Mr. Baumann's notes do not reflect whether or how this question was resolved.

8

allow for virtual employees to expense office rental costs." (Doc. 52-6 at 2-3.) While Plaintiff Landvater contends that he did not receive any prior notification that Defendant had decided not to cover the rent for the Essex Junction office, Defendant asserts that Plaintiff Landvater first demanded reimbursement for this expense in connection with his departure in December 2015. Prior to that point, Plaintiff Landvater had not submitted an expense claim for the Essex Junction office.

Defendant paid for certain office expenses for the duration of Plaintiff Landvater's employment, as it did for other employees who worked remotely, including: (1) cloud computing and managed server hosting; (2) a telephone line and Internet; and (3) WebEx for online meetings and web conferencing. These expenses were paid by Sarah Nemec, Defendant's Director of Financial Reporting, until her departure from the company on January 3, 2014. Thereafter, all day-to-day accounting, including payment of office expenses for Plaintiff Landvater, was handled by Defendant's consultant, Laura Hudson, and Defendant's then-Vice President Assistant Comptroller, Eric Haeussler. If Defendant was delinquent in making these expense payments, Mr. Haeussler authorized Plaintiff Landvater to pay these invoices directly and submit them to Defendant as an expense claim.

Throughout his employment with Defendant, Plaintiff Landvater had a company email address, conference call number, and login credentials for online meetings and video conferencing. Defendant further provided Plaintiff Landvater with access from Vermont to Defendant's internal servers and a user identification and password for Defendant's internal network. According to Mr. Savari, Defendant "provides these services to all [of] its employees" which were "especially necessary" for Plaintiff Landvater because he "was working remotely." (Doc. 29-1 at 3-4, ¶ 9.)

From Vermont, Plaintiff Landvater participated in conference calls with Defendant's employees "nearly every day." (Doc. 25-1 at 2, ¶ 11.) He attended sales meetings for Walmart, CVS Pharmacy, and O'Reilly Auto Parts with other employees, although his declaration does not state where these meetings took place. Every project that Plaintiff Landvater worked on, including Princess Auto, Sigma, and Kraft, was

completed with Defendant's knowledge and at Defendant's direction. None of the clients Plaintiff Landvater worked for while employed by Defendant were located in Vermont.

In the course of his employment with Defendant, Plaintiff Landvater reported to Mr. Groneck, Vice President of Defendant's Product Management Group, who worked at Defendant's Rockville, Maryland office. After Defendant transferred Plaintiff Landvater "from the Product Management Group to the lab[,]" he reported to Defendant's personnel in its Montreal, Quebec office. (Doc. 25-1 at 2, ¶ 7.) According to Mr. Johnston, Plaintiff Landvater "worked out of his home in Vermont and had very little supervision[,]" and Defendant "did not control [Plaintiff] Landvater's work hours, . . . did not control the manner in which [he] handled the few customers using the Flowcasting software and other software, and . . . did not control the number of hours [he] devoted to these various customers." (Doc. 4-1 at 6, ¶ 24.) Similarly, Mr. Savari states that Defendant provided "some supervision of [Plaintiff] Landvater's work, but only in a very loose definition of the term 'supervise.'" (Doc. 29-1 at 3, ¶ 7.) Rather, in Mr. Savari's view, Plaintiff Landvater "largely worked unsupervised, without any day-to-day control over his work schedule[,]" and Defendant "did not control where [Plaintiff] Landvater worked, the hours he worked, when he chose to work, or the method by which [he] completed his projects." *Id.*

In addition to hiring Plaintiff Landvater, on April 27, 2014, Defendant hired Paul Thompson to work as a Senior Quality Engineer, presenting him with an offer of employment signed by TongSuk Vignone, Defendant's Senior Corporate Recruiter, and effective May 5, 2014.[4] Mr. Thompson worked from Plaintiff Landvater's office in Essex Junction, Vermont and was hired for the specific purpose of providing software testing of Flowcasting for Kraft, Sony Canada, Sigma, and Princess Auto. Plaintiff

---

[4] Mr. Savari asserts that, in August 2015, he "discovered that [Plaintiff] Landvater had hired Mr. Thompson as a part-time employee working with [Plaintiff] Landvater out of [Plaintiff] Landvater's home office." (Doc. 29-1 at 3, ¶ 8.) Mr. Savari further maintains that it "appeared to [him] that [Plaintiff] Landvater had independently hired Mr. Thompson." *Id.* Defendant does not dispute, however, that Mr. Thompson was presented with an offer of employment signed by Defendant's Senior Corporate Recruiter.

10

Landvater informally supervised Mr. Thompson on behalf of Tom Perrone, who formally managed Mr. Thompson but did not have expertise in the duties Mr. Thompson performed. According to his declaration, Plaintiff Landvater agreed to keep Mr. Perrone abreast of any potential problems and provide information for Mr. Thompson's performance review so that Mr. Perrone could avoid the expense of traveling to Vermont. Plaintiff Landvater officially supervised one employee, Tony Verdi, who worked in Defendant's Rockville, Maryland office.

Plaintiffs' Complaint alleges that "[t]hroughout the summer and fall of 2014, [Defendant] continued to refuse to sell Flowcasting while also deferring the necessary changes to Demand/Fulfillment to integrate the two systems." (Doc. 9 at 8, ¶ 47.) "Because [Defendant] was failing to take the necessary steps to create the integrated product the parties had envisioned," in January 2015, Mr. Martin met with Baljit Dail, who had succeeded Mr. Brewer as Defendant's CEO. *Id.* at 8, ¶ 48. Mr. Martin expressed his concern that the "new" product Defendant was promoting, "JDA Flowcasting, was not the integrated product at all and was merely [Defendant]'s own Demand/Fulfillment product." *Id.* (internal quotation marks omitted). "In the summer of 2015, [Defendant] determined that rather than change the old Demand/Fulfillment system to meet the store-level needs, [it] should develop an entirely new system incorporating Flowcasting." *Id.* at 8, ¶ 50. However, Defendant "continued to fail to develop a new system incorporating Flowcasting[]" even though it continued to use the "Flowcasting" name and brand to promote Demand/Fulfillment, which it had renamed JDA Flowcasting. *Id.* at 8, ¶ 51.

## C. Defendant's Retention Agreement with Plaintiff Landvater.

On December 2, 2015, Defendant eliminated Plaintiff Landvater's and Mr. Thompson's positions, thereby terminating their employment. Mr. Johnston avers that Plaintiff Landvater was terminated "as part of a reorganization and role elimination." (Doc. 4-1 at 6, ¶ 26.) He further maintains that, upon terminating Plaintiff Landvater, Defendant "learned that [he] had been providing some support to a few [of Defendant's] customers outside of his agreement with [Defendant]" such that Defendant "had to rehire

11

[Plaintiff] Landvater so that he could transfer support and maintenance of these customers to [Defendant]." *Id.* at 6-7, ¶ 26. Two days later, on December 4, 2015, Defendant re-hired Plaintiff Landvater pursuant to a new agreement (the "Retention Agreement"), which states that Defendant "wishe[d] to offer [Plaintiff Landvater] the opportunity to remain employed by JDA through March 31, 2016, at the same salary and with the same benefits as those in effect" previously, but "on the [new] terms and conditions set forth [in the Retention Agreement.]" (Doc. 4-2 at 2.) The Retention Agreement provides that Plaintiff Landvater would receive a $20,000 retention period bonus, in addition to his salary, unless he voluntarily terminated his employment with Defendant prior to March 31, 2016, was terminated for cause by Defendant prior to March 31, 2016, or suffered death or an incapacitating disability prior to March 31, 2016. Unlike Plaintiff Landvater's former employment agreement with Defendant, the Retention Agreement does not contain a forum selection clause or choice of law provision. Neither Plaintiffs' Complaint nor the parties' submissions establish the location where the Retention Agreement was signed.

The precise date of the termination of Plaintiff Landvater's employment with Defendant is uncertain. Mr. Johnston states that Plaintiff Landvater's "employment ended in March of 2016," while Plaintiff Landvater maintains that he remained employed through March 31, 2016. (Doc. 4-1 at 7, ¶ 26.)

**D.  Defendant's Worldwide Operations and Contacts with Vermont.**

Defendant has offices worldwide, including an office in Montreal, Quebec. It has thirteen domestic office locations in twelve different states, including an office in Boston, Massachusetts. The Montreal office has twenty-six employees, and the Boston office has thirty-five employees.

Defendant has over 4,000 customers. Its Vermont customers include: (1) the Vermont Department of Liquor Control; (2) the Brattleboro Retreat; (3) Keurig Green Mountain, Inc.; (4) Bruegger's Enterprises, Inc.; (5) Farrell Distribution Corporation; (6) Country Home Products; (7) Calmont Beverage; (8) De Witt Beverage; (9) Baker Distributing Corporation; (10) LHI Technology USA; and (11) Northeast Cooperatives.

12

Customers with locations in Vermont include Walmart, Lowe's Home Improvement, and CVS Pharmacy. According to Defendant, a number of these entities purchased Defendant's software from third parties or companies subsequently acquired by Defendant, and half of these entities have no ongoing maintenance contract or other contacts with Defendant. Neither Plaintiff serviced Defendant's customers in Vermont.

In 2016, Defendant's revenues from maintenance fees for Vermont customers totaled $352,508.48, which constituted less than 0.04% of its total annual revenue of approximately $900 million. For fiscal years 2013 through 2015, less than one-tenth of 1% of Defendant's revenue came from business in Vermont. In his affidavit, Mr. Johnston avers that Defendant is not registered to do business in Vermont, does not own real property in the state, and does not have a Vermont address or telephone number.

At present, Defendant employs two individuals, Chelsea Jean Vorpahl, a Business Development Representative, and Lisa Ann Magliono, an Enterprise Solution Architect, who reside and work in Vermont and report to Defendant's Rockville, Maryland office. Ms. Magliono has worked for Defendant since June 4, 1998. Plaintiffs do not allege that either of these individuals had any involvement with Flowcasting or worked with Plaintiff Landvater.

With regard to potential witnesses in this legal proceeding, Mr. Savari and Mr. Johnston, who are both Georgia residents, work at Defendant's Atlanta, Georgia office. Mr. Brewer is no longer employed by Defendant; his last known place of residence is in Aptos, California. Mr. Dail is also no longer employed by Defendant and resides in New York. Plaintiff Landvater and Mr. Thompson live in Vermont. Mr. Groneck and Mr. Verdi reside and work in Maryland.

## II. Procedural Background.

On February 16, 2017, Plaintiffs filed their Complaint in Vermont state court, alleging that Defendant refused to comply with the terms of the MIPA by failing to complete the development of a single, integrated software product; to market and promote that product; to continue the sale and promotion of Plaintiffs' original Flowcasting software developed in Vermont; and to pay Plaintiffs $7 million as required

13

by the MIPA. Plaintiff Landvater also seeks payment of a promised retention bonus which he contends Defendant failed to pay him pursuant to the Retention Agreement. On April 14, 2017, Defendant removed the matter to this court.

## III.  Conclusions of Law and Analysis.

### A.  Standard of Review.

"In the absence of a federal statute specifically directing otherwise, and subject to limitations imposed by the United States Constitution, [the court] look[s] to the law of the forum state to determine whether a federal district court has personal jurisdiction over a foreign corporation." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016) (citing Fed. R. Civ. P. 4(k)(1)(A)). "On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996).

"In evaluating whether the requisite showing has been made, [the court] construe[s] the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013). "The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012). "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal quotation marks omitted).

As the Second Circuit has explained:

> [I]n resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry. First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process.

14

*Ehrenfeld v. Mahfouz*, 489 F.3d 542, 547 (2d Cir. 2007) (internal quotation marks omitted) (quoting *Metro. Life Ins. Co.*, 84 F.3d at 567).

In Vermont, state courts may exercise personal jurisdiction over a non-resident defendant "to the full extent permitted by the . . . Due Process Clause" of the Fourteenth Amendment. *State v. Atl. Richfield Co.*, 2016 VT 22, ¶ 10, 201 Vt. 342, 349, 142 A.3d 215, 220 (internal quotation marks omitted); *see also In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745 F.3d 30, 38 (2d Cir. 2014) ("Vermont's long-arm statute . . . reflects a clear policy to assert jurisdiction over individual defendants to the full extent permitted by the Due Process Clause.") (internal citation, footnote, and quotation marks omitted). As a result, "the first part of [the] inquiry—the interpretation of the Vermont law governing service of process—merges with the second part of the jurisdictional test: whether the court's exercise of personal jurisdiction over the defendant satisfies the requirements of due process." *Metro. Life Ins. Co.*, 84 F.3d at 567. This "analysis consist[s] of two components: the 'minimum contacts' test and the 'reasonableness' inquiry." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002); *see also N. Aircraft, Inc. v. Reed*, 572 A.2d 1382, 1386 (Vt. 1990) (providing that "once the court determines that a nonresident defendant has purposefully established minimum contacts within the forum State, . . . several factors must be considered to ensure that exercising personal jurisdiction over the defendant is reasonable") (citation and internal quotation marks omitted).

"To determine whether a defendant has the necessary 'minimum contacts,' a distinction is made between 'specific' and 'general' personal jurisdiction." *In re Terrorist Attacks*, 714 F.3d at 673. Specific jurisdiction "exists when a forum exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum[.]" *Id.* at 673-74 (alteration and internal quotation marks omitted). In contrast, general jurisdiction "is based on the defendant's general business contacts with the forum and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." *Id.* at 674 (alteration and internal quotation marks omitted). "A court deciding whether it has jurisdiction over an

15

out-of-state defendant under the Due Process Clause must evaluate the 'quality and nature[]' . . . of the defendant's contacts with the forum state under a totality of the circumstances test[.]" *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

## B.     Whether General Jurisdiction Exists.

A corporation is subject to general jurisdiction in a forum when "'the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945)). "[T]he general jurisdiction inquiry 'is not whether a foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic,'" but rather "'whether that corporation's affiliations with the State are *so* continuous and systematic *as to render it essentially at home* in the forum.'" *Brown*, 814 F.3d at 627 (quoting *Daimler v. Bauman*, 134 S. Ct. 746, 761 (2014)).

"With respect to a corporation, the place of incorporation and principal place of business are paradigm bases . . . for general jurisdiction." *Daimler*, 134 S. Ct. at 760 (alteration and internal quotation marks omitted). A corporation's principal place of business is "the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010). "In practice, this should normally be the place where the corporation maintains its headquarters— provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the 'nerve center.'[]" *OneWest Bank, N.A. v. Melina*, 827 F.3d 214, 218 (2d Cir. 2016) (citing *Hertz*, 559 U.S. at 93) (internal quotation marks omitted).

As the Second Circuit recently observed:

> [I]n assessing the extent of a corporation's contacts in a state for general
> jurisdiction purposes, we must assess the company's local activity not in
> isolation, but *in the context of the company's overall activity*: the general
> jurisdiction inquiry "does not focus solely on the magnitude of the

defendant's in-state contacts," but "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide."

*Brown*, 814 F.3d at 629 (quoting *Daimler*, 134 S. Ct. at 762 n.20). "Only in the 'exceptional' case will another jurisdiction be entitled to exercise such sweeping powers as the use of its adjudicatory authority to decide matters unrelated to its citizens or to affairs within its borders." *Id.* at 627 (quoting *Daimler*, 134 S. Ct. at 761 n.19).

In *Brown*, the Second Circuit found defendant Lockheed Martin's contacts with the forum of Connecticut were insufficient under *Daimler* to permit the exercise of general jurisdiction. The Second Circuit explained that "Lockheed's business in Connecticut, while not insubstantial, constitute[d] only a very small part of its portfolio[;]" that, "in each of the years from 2008 through 2012, when suit was filed, its Connecticut-based employees represented less than 0.05% of Lockheed's full workforce[;]" and that the "$160 million in gross revenue that Lockheed derived from its Connecticut operations over five years never exceeded 0.107% of the company's total annual revenue." *Id.*

Under *Brown* and *Daimler*, Defendant's contacts with Vermont "fall far short of the relationship that Due Process requires[] . . . to permit the exercise of general jurisdiction[.]" *Id.* at 630. Defendant is incorporated in Delaware and its principal place of business and "nerve center" is in Arizona. Defendant is not registered to do business in Vermont, does not own real property in the state, and does not have a Vermont address or telephone number. Beyond employment of Ms. Vorpahl and Ms. Magliono in Vermont, Defendant has no physical presence in the state. Of Defendant's 4,000 clients, only eleven are Vermont entities. The income Defendant derived from these Vermont clients in fiscal year 2016 totaled $352,508.48, less than 0.04% of its total annual revenue of approximately $900 million. For fiscal years 2013 through 2015, less than one-tenth of one percent of Defendant's revenue came from business in Vermont.[5]

---

[5] Plaintiffs argue that general jurisdiction exists because Defendant has several major customers with Vermont locations and directs marketing and promotional materials to Vermont residents. In light of the Supreme Court's decision in *Daimler*, this activity does not establish general jurisdiction. *See Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) ("Although

17

For the reasons cited above, the court lacks general jurisdiction over Defendant. It thus turns to whether an exercise of specific jurisdiction comports with Due Process.

### C. Whether Specific Jurisdiction Exists.

"[A] State may authorize its courts to exercise [specific] personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Goodyear*, 564 U.S. at 923 (alteration in original) (quoting *Int'l Shoe*, 326 U.S. at 316). "For the purpose of establishing specific personal jurisdiction, the necessary fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *In re Terrorist Attacks*, 714 F.3d at 674 (internal quotation marks omitted); *see also Bristol-Myers Squibb Co. v. Super. Ct. of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017) (stating that "there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.") (internal quotation marks and alteration omitted).

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (internal quotation marks omitted). If the court determines that the defendant has sufficient minimum contacts to establish jurisdiction, the court must then decide if the exercise of jurisdiction would be reasonable under the circumstances. *See Metro. Life Ins. Co.*, 84 F.3d at 568 ("A

---

Brown urges that the test is not so restrictive, in our view *Daimler* established that, except in a truly 'exceptional' case, a corporate defendant may be treated as 'essentially at home' only where it is incorporated or maintains its principal place of business—the 'paradigm' cases."). The only evidence Plaintiffs proffer in support of their claim that Defendant directs marketing and promotional materials to Vermont residents is an email to Plaintiffs' counsel from Defendant's information desk. Defendant contends that "[Plaintiffs' counsel] received [the email] after registering and requesting information from [Defendant's] website." (Doc. 18 at 2, n.2.) Plaintiffs' "unilateral activity" cannot create Defendant's contacts with Vermont. *Walden v. Fiore*, 134 S. Ct. 1115, 1123 (2014) (internal quotation marks omitted).

18

reviewing court must first examine the defendant's contacts with the forum. If the same do not exist in sufficient abundance[] . . . the inquiry ends.").

Accordingly, in order for the court to exercise "case-linked" or specific jurisdiction, "the suit must arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (emphasis, internal quotation marks, and alterations omitted). There must be "'some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Goodyear*, 564 U.S. at 924 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 134 S. Ct. at 1122. "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers Squibb*, 137 S. Ct. at 1781.

Where specific jurisdiction is alleged to arise from a contractual relationship, the court considers "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing[.]" *Burger King*, 471 U.S. at 479. "If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, . . . the answer clearly is that it cannot." *Id.* at 478.

In this case, Plaintiffs argue that Defendant purposefully directed its activities at Vermont by entering into long-term contractual and business relationships with a Vermont company and a Vermont resident. As part of these ongoing relationships, Plaintiffs contend Defendant exercised control over their employment, as well as over intellectual property developed in Vermont which Defendant sought to integrate with its own property as part of a collaborative business venture. Plaintiffs further allege that they suffered the injuries Defendant inflicted in Vermont.

Defendant counters that specific jurisdiction does not exist merely because Plaintiffs chose to work from a Vermont location that Defendant neither required nor controlled. It points out that the agreements upon which Plaintiffs base their claims were

19

not primarily negotiated in Vermont, do not require activities in Vermont, and have a greater relationship with the forums of other states. Although this case presents a close question, Defendant's arguments take too narrow a view of the operative facts.

In December of 2012, when Defendant merged with RedPrairie Corporation, it succeeded to the latter's 50% interest in a Joint Venture with a Vermont entity whose primary contribution to the Joint Venture was intellectual property developed in Vermont. Through a call option, Plaintiff Retail Pipeline's interest in the Joint Venture was valued at $10 million. The Joint Venture had reached a tentative deal with a major client that was anticipated to result in $84 million in revenue over three years. The business relationship at issue was therefore neither fleeting nor insubstantial.

Thereafter, Defendant's then-CEO Hamish Brewer initiated discussions with Plaintiff Landvater and Mr. Martin, proposing that they dissolve the Joint Venture and replace it with a new agreement between Defendant and Plaintiff Retail Pipeline. Pursuant to this new agreement, Demand/Fulfillment and Flowcasting would be integrated for sale to potential customers. In reaching out in this manner, Defendant was aware that Plaintiff Landvater was a Vermont resident and Plaintiff Retail Pipeline was a Vermont limited liability company. While relevant to the specific jurisdiction inquiry, this fact "is not dispositive because it would impermissibly establish 'minimum contacts' based solely upon the plaintiff's location." *RLB & Assocs., Ltd. v. Aspen Med. Pty.*, 2016 WL 344925, at *5 (D. Vt. Jan. 27, 2016) (citing *Burger King*, 471 U.S. at 478). As a result, the focus is not on the residency of the Plaintiffs, but on the fact that Defendant initiated a business relationship with them that was intended to integrate a software product developed by Plaintiffs with Defendant's own intellectual property in an ongoing, mutually beneficial relationship. *See Burger King*, 471 U.S. at 479 (finding it pivotal that the defendant "deliberately reached out" to the plaintiff in the forum state) (alteration and internal quotation marks omitted).

The parties subsequently entered into the MIPA which was negotiated via telephone and in person in Arizona. The MIPA was signed by Defendant in Arizona and by Plaintiffs in Vermont. During the MIPA negotiations, Defendant communicated with

Plaintiffs and Plaintiffs' Vermont law firm on an almost daily basis. *See id.* at 481 (approving the exercise of personal jurisdiction and noting that the defendant "carried on a continuous course of direct communications by mail and by telephone"). Although the MIPA does not require the performance of any contractual obligations in Vermont and includes a choice of law provision stating that Delaware law governs its interpretation, *see CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366-67 (2d Cir. 1986) (noting that "a choice of law provision" deserves "some weight" when analyzing personal jurisdiction), it does not contain a forum selection clause. *See Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 76 (2d Cir. 2009) (noting that "[a] forum selection clause may bind parties to . . . a specific jurisdiction"). While these facts do not weigh substantially in favor of an exercise of personal jurisdiction, Defendant's procurement of the MIPA and the nature of the activities it required Plaintiffs to perform thereunder do.

The MIPA contemplated a multi-million dollar business relationship between Plaintiff Retail Pipeline and Defendant for over four years which Defendant knew Plaintiffs would perform, at least in part, from their offices in Vermont. Defendant facilitated that performance in Vermont through the provision of corporate services and through an employment agreement with Plaintiff Landvater which it understood he would perform remotely from Vermont. Indeed, Plaintiff Landvater's employment with Defendant was a condition precedent to Plaintiff Retail Pipeline's right to receive the full value of the $7 million earn-out payment contemplated in the MIPA. In its written offer of employment, Defendant required Plaintiff Landvater to devote his "full time, attention and efforts to the performance of . . . duties as [Defendant] may establish from time to time." (Doc. 52-3 at 3.) Plaintiff Landvater supervised himself and two of Defendant's other employees from Plaintiffs' Vermont location. Although Defendant did not mandate Plaintiffs' Vermont-based activities, it embraced them by creating and maintaining contractual and business relationships based thereon. More importantly, Defendant concedes that Plaintiff Landvater was working in and from Vermont on its behalf.[6] In

---

[6] *See* Doc. 4-1 at 6, ¶ 23 (Plaintiff Landvater worked for Defendant's "customers using the Flowcasting software" and provided "support to [Defendant's] employees in development of

21

December of 2015, Defendant again reached out to Plaintiff Landvater, re-hiring him pursuant to the Retention Agreement because it "wishe[d]to offer [Plaintiff Landvater] the opportunity to remain employed by [Defendant] through March 31, 2016[.]" (Doc. 4-2 at 2.)[7]

At the time of Plaintiff Landvater's termination in March 2016, Defendant had maintained an ongoing multi-million dollar contractual and business relationship with Plaintiffs since December of 2012. Defendant's contacts with Vermont are thus neither isolated nor attenuated, but rather purposeful, substantial, and continuous.

Against this backdrop, it was reasonably foreseeable to Defendant that Plaintiffs' claims arising out of the MIPA and the Retention Agreement would be litigated in Vermont. *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 32 (2d Cir. 1996) (finding that the defendants had "deliberately reached out beyond their home states" in concluding that they "purposefully availed themselves of the forum and should have reasonably foreseen being haled into court [t]here.") (alteration and internal quotation marks omitted); *see also Burger King*, 471 U.S. at 475-76 (finding "where the defendant . . . has created 'continuing obligations' between himself and residents of the forum, . . . he manifestly has availed himself of the privilege of conducting business there," such that "it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.") (citations omitted).

Defendant's argument that this case is "on all fours" with *RLB & Associates, Ltd. v. Aspen Medical Pty.* is misplaced. (Doc. 4 at 9.) In *RLB*, this court dismissed the plaintiff's complaint for lack of specific personal jurisdiction. The differences between the two cases, however, are stark. The defendants in *RLB* "were aware of [the]

---

[Defendant's] software suite."); *id.* at 7, ¶ 26 (Defendant entered into the Retention Agreement because it needed Plaintiff Landvater to "transfer support and maintenance of [Defendant's] customers to [Defendant's other staff].").

[7] Despite Defendant's apparent superior bargaining power, the Retention Agreement contains neither a forum selection clause nor a choice of law provision, unlike Plaintiff Landvater's employment agreement. There is at least an argument that the Retention Agreement is governed by the laws of Vermont.

[p]laintiff's Vermont location, voluntarily agreed to contract with [the] [p]laintiff, and made payments to [the] [p]laintiff in Vermont." *RLB*, 2016 WL 344925, at *5. However, the defendants did not "reach out" to the plaintiff, "but instead were solicited by [the] [p]laintiff to enter into a business relationship." *Id.* (internal quotation marks omitted). The agreement in *RLB* "neither imposed any long-term obligations or exacting restrictions on either party, nor required any activity to take place in Vermont." *Id.* at *6. Instead, the parties' contract provided for a six-month term, which "thereafter, shall be renewed for additional three month periods unless terminated by either party with thirty days written notice." *Id.* at *2 (alterations and internal quotations marks omitted). The parties' agreement contemplated that the plaintiff would receive a $2,000 retainer fee each month and a "Success Fee" for each business relationship the plaintiff facilitated between the defendants and a third party located in Latin America, determined by a percentage of the annual fees and revenue resulting from the business relationship. *Id.* (internal quotation marks omitted). *RLB* thus involved a contract of short duration and a comparatively limited payout in comparison to the MIPA and Retention Agreement.

Of equal importance is the fact that, unlike the instant case, the agreement in *RLB* did not create an employment relationship, nor did the defendants provide the plaintiff with company property or services or supervise any aspect of his work. In turn, the plaintiff did not supervise any of the defendants' employees or maintain substantial and ongoing contact with them. Instead, the defendants' only contact with Vermont was the fact that the plaintiff lived in Vermont and conducted his consulting business from that state. *RLB* is thus clearly distinguishable from the facts at issue here.

Because Plaintiffs have established that their claims "arise out of or relate to [Defendant's] contacts" with Vermont, *Bristol-Myers Squibb*, 137 S. Ct. at 1780 (internal quotation marks and alterations omitted), and Defendant "purposefully directed [its] activities at residents of the forum," *In re Terrorist Attacks*, 714 F.3d at 674 (internal quotation marks omitted), they have established the requisite "minimum contacts."

Having concluded that "minimum contacts" exist, the court turns to whether the exercise of personal jurisdiction over Defendant comports with "traditional notions of fair

play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted). In making this determination, the court evaluates:

> [1] the burden on the defendant, [2] the forum State's interest in adjudicating the dispute, [3] the plaintiff's interest in obtaining convenient and effective relief, [4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and [5] the shared interest of the several States in furthering fundamental substantive social policies."

*Burger King*, 471 U.S. at 477 (internal quotation marks omitted). "The import of the 'reasonableness' inquiry varies inversely with the strength of the 'minimum contacts' showing—a strong (or weak) showing by the plaintiff on 'minimum contacts' reduces (or increases) the weight given to 'reasonableness.'" *Bank Brussels Lambert*, 305 F.3d at 129. "In this case, because Plaintiff[s] [have] not made a compelling demonstration of 'minimum contacts,' the court examines the 'fairness factors' with greater scrutiny." *Mansfield Heliflight, Inc. v. Freestream Aircraft USA, Ltd.*, 2016 WL 7176586, at *10 (D. Vt. Dec. 7, 2016).

Plaintiffs assert that litigation in Vermont would not be burdensome for Defendant because it has already retained Vermont counsel to defend this dispute; has an international presence and annual revenues of $900 million; has employed at least two individuals in Vermont for almost twenty years in addition to Plaintiff Landvater and Mr. Thompson; and has numerous Vermont customers which are large corporate entities by Vermont standards. Defendant responds that because the majority of its witnesses are located outside of Vermont and Vermont has no "skin in the game[,]" (Doc. 4 at 12) (internal quotation marks omitted), it is unreasonable to expect Defendant to litigate in this forum when other forums with allegedly more substantial connections to this lawsuit exist.

In evaluating whether the exercise of personal jurisdiction will result in the efficient administration of justice, the court "generally consider[s] where witnesses and evidence are likely to be located." *Metro. Life Ins. Co.*, 84 F.3d at 574. While Defendant claims that "the bulk of the witnesses with relevant information to this dispute are located in Scottsdale, Arizona, where the negotiations regarding the MIPA took place[,]" (Doc.

24

18 at 5), it does not identify any specific individuals located in Arizona who have relevant information. The two witnesses who submitted affidavits for Defendant, Mr. Savari and Mr. Johnston, work in Atlanta, Georgia. With respect to Plaintiffs, their witnesses include Plaintiff Landvater and Mr. Thompson, both of whom live in Vermont, and Mr. Martin, who lives in Montreal. Mr. Dail, Mr. Brewer's replacement, lives in New York. Mr. Brewer is believed to be living in California, and Mr. Groneck and Mr. Verdi reside in Maryland. Because it appears that there is no single forum in which a substantial majority of witnesses are located, "this factor does not point decisively in favor of the reasonableness or unreasonableness of exercising personal jurisdiction." *Irving v. Revera, Inc.*, 2011 WL 5329726, at *5 (D. Vt. Nov. 4, 2011).

Although there is no optimal forum, the financial and logistical burdens Defendant faces in litigating in Vermont are minimal. *See Bank Brussels Lambert*, 305 F.3d at 129-30 ("[T]he conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.") (internal quotation marks omitted). Defendant is an international software company with over $900 million in annual sales revenue and office locations worldwide, including office locations in Boston, Massachusetts and Montreal, Quebec that are a short drive from Burlington, Vermont. Any hardship in litigating in Vermont is thus easily overcome from both a financial and logistical standpoint. As a result, this fairness factor weighs in favor of an exercise of personal jurisdiction. *See Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010) ("In light of our holding that [the plaintiff] has made a threshold showing of minimum contacts at the first stage of the inquiry, . . . [the defendant's] generalized complaints of inconvenience arising from having to defend himself from suit in New York do not add up to a compelling case that the presence of some other considerations would render jurisdiction unreasonable.") (internal quotation marks and citation omitted).

Vermont has an interest in protecting its residents' business interests and providing redress for their alleged contractual injuries. *See Burger King*, 471 U.S. at 473 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors."); *see also Mansfield*

*Heliflight*, 2016 WL 7176586, at *11 (noting that "Vermont also has an interest in protecting its residents' business interests and in redressing their tortious and contractual injuries."). Plaintiffs are a Vermont company and a Vermont resident who were approached by Defendant to enter into relatively long-term business relationships and who claim that they were harmed when Defendant refused to market Flowcasting, a Vermont developed software product, in preference to its own product. In addition to their breach of contract claims, Plaintiffs have asserted claims of constructive fraud and breach of the implied covenant of good faith and fair dealing. As the crux of these claims is the fairness of Plaintiffs' treatment by Defendant, Vermont's interest in providing a forum for redress is not insubstantial. This fairness factor thus also weighs in favor of an exercise of personal jurisdiction.

Although Plaintiffs' decision to file suit in Vermont is by no means controlling, it is entitled to some weight as it reflects Plaintiffs' "interest in obtaining convenient and effective relief[.]" *Burger King*, 471 U.S. at 477 (internal quotation marks omitted); *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 169 (2d Cir. 2015) (noting that "Plaintiffs have an interest in adjudicating their case in the state where they reside."); *Chloé*, 616 F.3d at 173 (finding that this factor "necessarily favors" the plaintiff because its "headquarters are in New York[, the forum state,] and some of its witnesses are located there.").[8] More compelling are Plaintiffs' arguments that it will be unduly inconvenient to force them to litigate their claims in Delaware or Arizona. There is no indication that either Plaintiff has resources commensurate with those of Defendant so litigation elsewhere may be prohibitively expensive as well. This fairness factor therefore also weighs in favor of an exercise of personal jurisdiction.

---

[8] The authority cited by Defendant to support its position that litigation in Vermont will not be more efficient than in Arizona or another forum "simply because Plaintiffs have already filed suit in Vermont[]" (Doc. 18 at 6) is not on point. *See, e.g.*, *Hernandez v. Graebel Van Lines*, 761 F. Supp. 983, 990 (E.D.N.Y. 1991) (granting a motion to transfer when the plaintiff's chosen forum had "no material relation or significant connection" to the transaction or facts giving rise to the action.); *Unico Indus. Corp. v. S.S. Andros City*, 323 F. Supp. 896, 897 (S.D.N.Y. 1971) (granting a motion to transfer "when no judicially recognized circumstances have been shown to exist which would justify" the plaintiff's chosen forum).

Finally, the court must consider the common interests of the several states in promoting substantive social policies. Vermont has an interest in preventing fraud and ensuring good faith contractual agreements. As this interest is likely to be shared by other states, this factor is in equipoise. *See Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 245 (2d Cir. 1999)) ("The parties have not suggested or shown that any substantive social policies would be furthered or undermined by permitting the case against [the defendant] to go forward in [the forum state], . . . [so] [t]his factor thus does not weigh in either party's favor.").

On balance, the fairness factors weigh in favor of the court's exercise of personal jurisdiction over Defendant in Vermont. With employees currently working in Vermont, offices in adjoining jurisdictions, and Vermont customers which are substantial by Vermont standards, Defendant could reasonably foresee the need to defend litigation arising out of its business relationships with Plaintiffs in Vermont. It is therefore consistent with the Due Process Clause for this court to exercise specific personal jurisdiction. *See Chloé*, 616 F.3d at 173 (finding the first three factors favor jurisdiction and the last two factors are neutral and holding that "asserting jurisdiction over [defendant] comports with 'traditional notions of fair play and substantial justice,' . . . such that it satisfies the reasonableness inquiry of the Due Process Clause") (citation omitted).

## CONCLUSION

For the foregoing reasons, the court DENIES Defendant's motion to dismiss for lack of personal jurisdiction. (Doc. 4.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _30th_ day of March, 2018.

Christina Reiss, District Judge
United States District Court

27