UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2021 AUG 31   PM 4: 42**

CLERK

BY_____ |Aw/
DEPUTY CLERK

RETAIL PIPELINE, LLC and          )
DARRYL LANDVATER,                  )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )          Case No. 2:17-cv-00067
                                   )
BLUE YONDER GROUP, INC. *formerly* )
*known as* JDA SOFTWARE GROUP, INC.)
and BLUE YONDER, INC. *formerly known* )
*as* JDA SOFTWARE, INC.,           )
                                   )
          Defendants.              )

**OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND**
**GRANTING IN PART PLAINTIFFS' MOTION TO STRIKE**
(Docs. 100 & 108)

Plaintiffs Retail Pipeline, LLC ("Plaintiff Retail Pipeline") and Darryl Landvater

("Plaintiff Landvater") bring this action alleging breach of contract, breach of the implied

covenant of good faith and fair dealing, breach of a contract implied in law or fact, and

constructive fraud against Defendants Blue Yonder Group, Inc. and Blue Yonder, Inc.

(collectively, "JDA").[1] Pending before the court are: JDA's motion for summary

judgment on all counts (Doc. 100) and Plaintiffs' motion to strike JDA's reply to

Plaintiffs' statement of disputed facts. (Doc. 108.) On March 22, 2021, the court heard

oral argument at which time the court took the pending motions under advisement.[2]

---

[1] JDA was formerly known as JDA Software Group, Inc. and JDA Software, Inc. Throughout
their briefing they collectively refer to themselves as "JDA." The court will do so as well.

[2] At oral argument, the court dismissed Count V for breach of the retention agreement with the
parties' consent.

Plaintiffs are represented by Jennifer E. McDonald, Esq., Marc B. Heath, Esq., and Tristam J. Coffin, Esq. JDA is represented by Justin B. Barnard, Esq., and Karen McAndrew, Esq.

## I.      Plaintiffs' Motion to Strike JDA's Reply to Plaintiffs' Statement of Disputed Facts.

JDA filed a sixty-nine page "reply" to Plaintiffs' statement of disputed material facts in which they reject Plaintiffs' characterization of certain facts as disputed, assert that Plaintiffs mischaracterize the evidence, and assert new legal arguments. Under Local Rule 56(a) and (b), a moving party must include "a separate and concise statement of undisputed material facts[]" in support of its motion for summary judgment and a non-moving party must provide "a separate, concise statement of disputed material facts." Local Rule 56(a) affords JDA the opportunity to bring relevant factual matters to the court's attention, but it does not contemplate the filing of a reply to the non-moving party's statement of disputed facts. JDA also did not seek leave to file their "reply" before filing it with the court.

To the extent JDA's "reply" merely corrects the record or cites evidence admissible pursuant to the completion doctrine, it will be considered. *See* Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part — or any other writing or recorded statement — that in fairness ought to be considered at the same time."); *see also Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 276 (D. Vt. 2013) (holding "the court will follow [its previous decisions], and will disregard [a party's] additional facts unless it is clear from the parties' briefing that those facts are both material and undisputed"). The remainder of JDA's reply statement will not be considered. Plaintiffs' motion to strike (Doc. 108) is therefore GRANTED IN PART.

## II.     The Undisputed Facts.

### A.      The Parties.

Plaintiff Retail Pipeline is a Vermont limited liability company with its principal place of business in Essex Junction, Vermont. It was founded as a consultancy firm in the

2

mid-1990s by André Martin, a Canadian citizen and resident of Montreal, Quebec, and by Plaintiff Landvater, a Vermont resident. Mr. Martin and Plaintiff Landvater are supply chain professionals who have worked together since the 1970s in the implementation of Distribution Requirements Planning ("DRP") processes which assist businesses in managing inventory.

JDA is a multi-national company based in Arizona and founded in the mid-1980s. It is a leader in supply chain management and provides end-to-end retail and supply chain planning and execution products for more than 4,000 customers worldwide.

**B.    JDA's Demand and Fulfillment Product.**

JDA has developed a number of related software suites, including systems tailored to the retail, service, wholesale distribution, third-party logistics, and transportation sectors. JDA built some of these software suites itself and added others through acquisition and merger with other supply chain companies.

A major modern innovation in supply chain management was the concept of DRP, which uses forecasts of future demands for a product to determine when the product is likely to require replenishment. DRP also generates orders for additional quantities of product based on demand forecasts, current inventory levels, the time lapse between ordering a product and its receipt, and other data to ensure that the product is timely replenished before it is exhausted. DRP is intended to increase the efficiency of the supply system by allowing each node in the supply chain to maintain the optimum inventory while reducing the number of "stock-outs" (i.e., complete depletion of a stock of product), which leads to better customer service and increased sales.

JDA sells a DRP product called Demand and Fulfillment ("D&F"), which generates demand forecasts for a company's products and utilizes those demand forecasts to generate replenishment orders that are phased over time to reduce risk of stock-outs. D&F was originally developed in the 1990s for use in "time-phased" supply chain planning at the manufacturing and distribution center levels. D&F is used by hundreds of consumer goods companies and retailers, including Walmart, CVS, Lowe's, and Dick's Sporting Goods.

3

For many years, the supply chain industry has sought to facilitate better collaboration between retailers and suppliers to improve the efficiency of supply chains and realize significant savings. JDA saw a potential market for software that facilitated such collaboration and data-sharing between retailers and suppliers. During the early 2010s, it began to develop a "module" or add-on that worked with D&F. JDA's supply chain collaboration product was originally called Collaborative Shelf Planning Analytics ("CSPA").

C.     **Plaintiffs' Development and Marketing of its Flowcasting DRP.**

In the 1990s, DRP was used at the distribution center and manufacturing levels. In an effort to expand DRP to the retail store level, Mr. Martin and Plaintiff Landvater approached established supply chain software vendors and encouraged them to develop retail-focused DRP software. None of the companies agreed to develop retail-focused DRP software so Mr. Martin and Plaintiff Landvater decided to develop a retail-focused DRP software of their own.

Plaintiff Landvater had engaged in computer programming in the early 1970s and in college, but when he began working on development of retail DRP software he had not written code in twenty-five years. In preparation for development of DRP software, Plaintiff Landvater read a book on programming.

Between 1997 and 1998, Plaintiff Landvater developed the software product that he and Mr. Martin would later market under the name "Flowcasting." The Flowcasting software served two primary business functions: (1) it helped enable DRP by forecasting demand and generating time-phased orders to replenish products before they were depleted and (2) facilitated collaboration between retailers and suppliers on forecasts and replenishment orders.

In 2000, Plaintiff Retail Pipeline made an initial sale of Flowcasting to Sears for $450,000. However, Sears "abruptly shelved" the product and never proceeded with full implementation of Flowcasting. (Doc. 100-1 at 6, ¶ 30.) In 2003, when Plaintiff Retail Pipeline entered into a software licensing agreement for Flowcasting with a company called Tomax, Plaintiff Retail Pipeline was operating at a net loss. Under the Tomax

4

agreement, Plaintiff Retail Pipeline received an up-front payment of $150,000, with the potential for net revenue royalties and an option for Tomax to acquire Plaintiff Retail Pipeline after a four-year period. The Tomax agreement contained a best-efforts clause which required Tomax to use commercially reasonable efforts to license and market Plaintiff Retail Pipeline's software. By 2006, Plaintiff Retail Pipeline had "backed out" of the agreement with Tomax. According to Plaintiff Landvater, Plaintiff Retail Pipeline decided to "part[] ways with Tomax because of differences in vision about Flowcasting and its direction." (Doc. 100-1 at 7, ¶¶ 36, 37.)

In 2009, Plaintiff Retail Pipeline formed a new partnership to market Flowcasting with RedPrairie, a "well-established" multi-national supply chain software company. *Id.* at 7, ¶ 38. RedPrairie sold software for managing warehouse and transportation logistics, but "lacked expertise in planning and replenishment[.]" *Id.* at 7, ¶ 39. At the time, Plaintiff Retail Pipeline had recently launched a pilot of Flowcasting's supply chain collaboration capabilities using Flowcasting to manage replenishment of Kraft Foods at Sam's Club stores.

Plaintiff Retail Pipeline was only profitable for a single year (2000) before it sold its intellectual property to JDA in 2014.

### D.     The Joint Venture.

Plaintiff Retail Pipeline and RedPrairie entered into a joint venture, Retail Pipeline Collaborative Flowcasting Group, LLC (the "Joint Venture"), to which Plaintiff Retail Pipeline assigned the intellectual property associated with Flowcasting technology. Under the terms of the Joint Venture agreement, RedPrairie effectively acquired a 50% interest in Plaintiff Retail Pipeline's intellectual property in exchange for an up-front capital contribution to the Joint Venture. The Joint Venture agreement contained a buy-out provision, giving RedPrairie "put" and "call" options. Under the put option, RedPrairie could cause Plaintiff Retail Pipeline to buy it out for the value of its capital contributions and outstanding loans. Under the call option, RedPrairie could acquire the remaining 50% interest in the Joint Venture for $10,000,000, offset by RedPrairie's total capital contributions.

The Joint Venture sold Flowcasting over the next few years to retailers, including Sony Canada, Sigma Alimentos, and Princess Auto. The Sony Canada and Sigma Alimentos sales were completed in 2010 and in 2013. The Joint Venture did not make a profit.

### E.    JDA's Merger with RedPrairie and Plan to Acquire Flowcasting.

In late 2012, RedPrairie merged with JDA; the surviving corporation retained JDA's name and assumed RedPrairie's interest in the Joint Venture. JDA's chief executive officer, Hamish Brewer, was unaware of the Joint Venture or Plaintiffs' Flowcasting product prior to the merger.

At the time of the merger, JDA had a "well-established" DRP solution, D&F, which "interoperated" with its other product offerings. (Doc. 100-1 at 9, ¶ 50.) JDA was also working on its own collaboration product, CSPA. Shortly after the merger was announced, Mr. Brewer arranged due diligence meetings with Mr. Martin, Plaintiff Landvater, and the general manager of the Joint Venture to discuss Flowcasting. Because Flowcasting had already been successfully deployed in the collaboration between Kraft Foods and Sam's Club, JDA considered using the brand to "jumpstart its entrance into the collaboration marketplace." *Id.* at 10, ¶ 53. JDA was also interested in the patented algorithm Flowcasting utilized to forecast replenishment of slow-moving products. At the time, JDA had not developed an effective solution for slow-moving products and was interested in integrating Flowcasting's slow-moving product logic into D&F. Mr. Brewer testified that JDA was not interested in adopting and marketing Plaintiff Retail Pipeline's software itself.

In February 2013, Mr. Brewer met with Mr. Martin and Plaintiff Landvater to discuss the future of Flowcasting. After that meeting, Mr. Brewer sent an email reporting that they had reached an agreement in principle to develop a product branded "JDA Flowcasting" that would be an individually sellable software module integrated into JDA's D&F software suite. *Id.* at 12, ¶ 62 (internal quotation marks omitted). The acquisition of Flowcasting did not become final until over a year later.

In November 2012, Mr. Martin and Plaintiff Landvater believed that their DRP product was superior to JDA's. They remained realistic, however, and Plaintiff Landvater noted "the odds of getting them to get behind the [Flowcasting] software are small." *Id.* at 12, ¶ 65 (internal quotation marks omitted) (alteration in original). In an email, Plaintiff Landvater observed that the "reality is that for many executives, the measure of software is how much it sells, not what people say about it," and that because JDA had already sold D&F to a number of major retailers, "we're pretty far down the list compared to [JDA]." *Id.* at 12-13, ¶ 66 (internal quotation marks omitted) (alteration in original).

Plaintiff Landvater further observed that "nearly everyone agrees the current JDA product will not sell effectively into this market[,]" (Doc. 100-23 at 2) but acknowledged that JDA might elect to "pick some of the key features (such as slow-moving items)" from Flowcasting and "try to make them work in the current [JDA] software," even though, in his view, that was "not likely to work." (Doc 100-1 at 13, ¶ 67) (internal quotation marks omitted) (alteration in original).

## F.    JDA and Plaintiff Retail Pipeline's Negotiations for the Flowcasting Acquisition.

The plan for JDA's acquisition of the Flowcasting intellectual property coalesced "fairly quickly[,]" and by April 2013, the parties were discussing whether JDA would buy out Plaintiff Retail Pipeline's 50% interest in the Joint Venture. *Id.* at 13, ¶ 69. Plaintiff Landvater negotiated the contract from Vermont, Mr. Martin from Canada, and JDA personnel from various locations including Arizona, Georgia, and Maryland. At all relevant times, the Joint Venture and JDA were incorporated in Delaware.

Plaintiff Landvater and Mr. Martin believed that D&F was not suitable for use in the retail market without changes. In notes made in preparation for a meeting, either Plaintiff Landvater or Mr. Martin wrote, "Flowcasting [was developed] . . . from a clean sheet of paper for retail at store-level, and we've spent the last 15 years solving the practical problems, let's use that." (Doc. 100-1 at 17, ¶ 85) (internal quotation marks omitted) (omission in original). In July 2013, Mr. Brewer rejected that approach and responded:

7

> I want to be clear about the approach with the product. I am not willing to support a scenario that involves retaining the existing Flowcasting software as a long term offering. In fact we must agree that we are going to absolutely limit the number of additional sales of the current product and focus all of our energies on building a new offering which leverages the IP and learnings of Flowcasting, but which is an integrated part of the [D&F] suite of software. I want to end up with one code base. If you cannot really support this strategy then we can't do this deal.

(Doc. 100-34 at 2.) He further noted that if the parties entered into an agreement, Plaintiffs would "d[e]rive the earnout solely on the license revenue numbers of the [products] that we agree up front will be sellable modules of the JDA offering which are largely based on the Flowcasting IP[,]" and that "[i]f we take any elements of the Flowcasting IP that are not defined as separate . . . modules and embed them into [D&F] or any other product for solution completeness reasons, there would be no revenue contribution to the earnout from this IP[.]" *Id.* Mr. Martin advised that "they had a deal." (Doc. 100-1 at 17, ¶ 88.)

In October 2013, Mr. Martin proposed that the term sheet and contract include a requirement that JDA form a committee to decide which features of Flowcasting would be integrated into JDA's D&F suite, and that those changes occur in a year's time. Thereafter, Mr. Martin and Plaintiff Landvater drafted a list of specific features they wanted to see in the product integrating Flowcasting with D&F and asked that the contract and term sheet stipulate to that list of features. Mr. Martin acknowledged in deposition that there was no agreement to adopt this approach:

> Q.     Now in your e-mail responding to this you tell Bob [White, a JDA representative] that "We are good to go if the term sheet and contract stipulates that the merged version of Flowcasting and Demand and Fulfillment will include the features we described"; is that correct?
>
> A.     Yup.
>
> . . .
>
> Q.     . . . You say you will be good to go if the term sheet and contract stipulates to the features you've described. Did JDA ever stipulate through the term sheet and contract to those changes?
>
> A.     No.

8

. . .

Q.     And you signed the ultimate contract with no guarantee that these features would be included; correct?

A.     Yes. But as I said earlier and I'll repeat it, it's not because we did not ask, but they came back and said we can't put that in the contract.

(Doc. 100-13 at 37-38.)

Mr. Martin conceded that Mr. Brewer was not going to want to "end up tying his product strategy to our contract negotiations." (Doc. 100-1 at 18, ¶ 93) (internal quotation marks omitted).

### G.     The Roadmap.

On December 16, 2013, Mr. Martin and Plaintiff Landvater travelled to Rockville, Maryland to meet with JDA personnel. Notes from this meeting were subsequently circulated in a ten-page email (the "Roadmap") and reflect a wide-ranging discussion of technical and performance issues relevant to the development of Flowcasting and potential improvements to D&F. JDA made some of the product changes reflected in the Roadmap but not others. The Roadmap lists as its subject "Flowcasting 2.0 Planning Discussion" and sets forth "[r]ough notes from today." (Doc. 100-38 at 2.) It includes an "Agenda" identifying subject matters and presenters such as "Frame out the current state/history for the team (Dan)" and "Working session to review known issues/gaps (All)" and "Develop prioritized roadmap delivery for Flowcasting 2.0 (Dan, Andre, Darryl, Ripu)" and indicates that the participants will discuss "[n]ext steps? Agreement on path forward." *Id.* The Roadmap addresses technical issues and marketing strategies, summarizes the state of the art and customer needs, and designates the "horizon" as either "short" or "medium" or none for certain objectives. It concludes with the following list of "Additional Questions:"

- What is our positioning strategy for Flowcasting versus D&F when positioning to a company[?]

- Who are we targeting with these solutions (current customers, prospects, etc[.]).
  - We are targeting both and the enhancements/improvements or closings of gaps is going to be the same between the two.

     o     We are heavily controlling our engagements so that we can be more prescriptive in controlling these customers (i.e. cloud to hide some of the inefficiencies).

*Id.* at 10-11. Nothing in the Roadmap sets forth a commitment by JDA to adopt certain features of Flowcasting or to produce a product that meets with Plaintiffs' specifications. The Roadmap is not drafted in contract form, does not contain contractual language, and has no place for signatures.

On December 19, 2013, in response to an email from Plaintiff Landvater, in which he asserted that the plan was for "fairly significant parts of Flowcasting [to] be incorporated into [D&F] for use with retail customers," David Johnston, a senior JDA executive, responded:

[a]lthough we (JDA) believe there could be some synergistic time-to-market advantages from our partnership to accelerate the delivery of some [of] the improvements mentioned . . . we do not see this as the main value driver of our new partnership. The driver of JDA wanting to move forward with a new agreement is the opportunity to significantly accelerate a growth revenue stream that could be captured from quickly becoming the market leader in the areas of "Strategic Collaborative Supply Chain Planning" and "Cross-Enterprise Joint Business Planning" between retailers and CPG manufacturers.

(Doc. 100-32 at 2-3.)

Mr. Martin testified that he did not have any basis to believe that anyone at JDA misrepresented the feasibility of the changes to JDA's products.

In July 2013, at Plaintiffs' urging, JDA agreed to expand the earn-out payment to include revenue from sales to both retail and manufacturing customers and that revenue would be tracked by creating separate sellable modules containing the Flowcasting intellectual property, each with its own stock keeping unit ("SKU"). JDA ultimately created a "JDA Flowcasting" module for collaboration and a "Slow Mover" module incorporating Plaintiff Retail Pipeline's slow-moving product algorithm. It tracked sales of each for purposes of the earn-out payments.

With regard to the earn-out provision in the MIPA, Plaintiff Landvater and Mr. Martin were "concerned that things were going to be dragging on and . . . from the time

the product was ready to be sold, . . . there would not be enough time left for the earn-out." (Doc. 100-1 at 14, ¶ 74) (internal quotation marks omitted) (first alteration in original). Mr. Martin suggested to Plaintiff Landvater that they insist on a provision that in the event the full $7,000,000 was not reached during the earn-out term, the parties would reconvene and negotiate the terms under which the remaining portion would be paid. Plaintiff Landvater responded by disagreeing with Mr. Martin's proposition and asked: "Does this obligate JDA to pay the full purchase price regardless of revenue or profit? If so, they have already said they will not do that." (Doc. 100-30 at 2.) In a September 2013 email to Mr. Brewer, Mr. Martin and Plaintiff Landvater asked JDA to remove the cut off date for earn-out payments; JDA declined that request. At the time, Mr. Martin and Plaintiff Landvater "could have walked away from the deal[,]" (Doc. 100-1 at 15, ¶ 79), because there was no requirement that Plaintiff Retail Pipeline agree to dissolve the Joint Venture.

JDA initially resisted Plaintiff Retail Pipeline's efforts to obtain a percentage of revenue from sales of D&F; however, it ultimately conceded when Plaintiff Retail Pipeline agreed to a 2018 cut off date for the earn-out payment in exchange for a share of revenue from D&F sales to retailers.

## H.    The Membership Interest Purchase Agreement (the "MIPA").

On February 25, 2014, after over a year of negotiations, the parties executed the Membership Interest Purchase Agreement ("MIPA") effectuating JDA's acquisition of the Flowcasting intellectual property. Under the terms of the MIPA, Plaintiffs agreed to transfer their membership interests in the Joint Venture to JDA and assigned the Flowcasting intellectual property to JDA in exchange for a guaranteed, up-front payment of $3,000,000, to be paid in three installments, in addition up to an additional aggregate amount of $7,000,000 in earn-out payments for revenue earned on certain products sold through December 31, 2018 comprised of "Revenue Stream 1," "Revenue Stream 2," and "Revenue Stream 3." Pursuant to the MIPA, Plaintiff Retail Pipeline would begin receiving earn-out payments of 12.5% for Revenue Streams 1 and 2 and 4% of Stream 3, once the aggregate revenue from Streams 1 and 2 exceeded $10,000,000. The calculation

of the earn-out was to be "determined in the reasonable discretion of JDA based on the internal accounting standards of JDA . . . in accordance with Generally Accepted Accounting Principles in the U.S. (GAAP)." (Doc. 100-1 at 24, ¶ 121) (internal quotation marks omitted) (alteration in original).

The MIPA provided JDA with a right of offset for, among other things, RedPrairie's prior capital contributions to the Joint Venture. The offset amount was to be disclosed in a schedule within ninety days after execution of the MIPA and, absent objection by Plaintiffs within thirty days, would become final.

JDA communicated to Plaintiff Landvater and Mr. Martin that JDA would continue to sell D&F. Plaintiff Landvater and Mr. Martin understood this because they ultimately asked for, and received, a right to a portion of future D&F revenue as part of the earn-out. The MIPA contains no agreement to cease selling D&F. It also contains no agreement to continue selling Plaintiffs' Flowcasting.

Plaintiff Landvater executed the MIPA in Vermont and Plaintiffs were represented by a Vermont-based law firm in its negotiation and execution. The consideration for the Joint Venture's relinquishment of its Flowcasting intellectual property was received by Plaintiff Retail Pipeline in Vermont. Section 6.7 of the MIPA expressly provides that the "Agreement will be governed by, and construed in accordance with, the laws of the State of Delaware[.]" (Doc. 100-15 at 12.)

## I.    Performance of the MIPA.

Consistent with the terms of the MIPA, JDA made the initial payment of $3,000,000 to Plaintiffs in three installments. JDA also disclosed an Offset Schedule within the prescribed ninety-day period detailing $559,665.93 in obligations that would be offset against any earn-out under the MIPA. Plaintiffs do not challenge the Offset Schedule or payments thereunder.

In April 2014, JDA announced and began to market JDA Flowcasting, a rebranding of JDA's collaboration product, CSPA, that was enhanced with improvements from Plaintiff Retail Pipeline's Flowcasting. Plaintiff Landvater testified that he did not agree with the press release about JDA Flowcasting and believed the public

12

announcement of the product under the name JDA Flowcasting was "completely false" or at least "highly misleading." (Doc. 100-7 at 31.)

JDA allowed limited sales of Flowcasting 1.0 during the earn-out period consistent with its previous representation to Plaintiffs that any such sales would be limited. JDA estimated that its total investment involved in integrating Plaintiff Retail Pipeline's intellectual property with JDA products was more than $7,000,000 in addition to what it paid Plaintiffs to acquire the Flowcasting intellectual property. JDA tracked revenue from its JDA Flowcasting product, together with revenue from the legacy customers using Plaintiff Retail Pipeline's Flowcasting product, under Revenue Stream 1. JDA also developed and sold an add-on module to D&F implementing Plaintiff Retail Pipeline's slow-moving product algorithm and crediting revenue to Revenue Stream 2.

At the end of the earn-out period, JDA reported an aggregate of $7,824,347.52 in revenue under Revenue Stream 1 and $10,017,721.95 under Revenue Stream 2, for a total of $17,842,069.47. The revenue from Stream 2 was not "dramatically different" than what JDA had forecast in 2013. The revenue target was $11.9 million through 2017. (Doc. 100-1 at 28, ¶ 145.) However, the revenue from Stream 1, "fell woefully short of predictions[,]" *id.*, which estimated $68.9 million between 2013-2016. There was no contribution to the earn-out from Revenue Stream 3 because sales of D&F to retail customers during the earn-out period never exceeded the $15,000,000 annual revenue threshold necessary to trigger a contribution to the earn-out. After the offset was applied, JDA made a $420,592.75 earn-out payment to Plaintiffs.

## III.  Disputed Facts.

### A.  Distribution and Fulfillment.

Plaintiffs argue that D&F is not suitable for retail use because there are numerous problems with it. For example, D&F uses time variable quantities and is "database inefficient[,]" which "does not work for the volume of SKUs (millions) at the retail level." (Doc. 104-1 at 3, ¶ 11.) Plaintiffs further assert that JDA's witnesses acknowledged "weakness in JDA's planning process across forecasting replenishment and allocation[]" that JDA's software could not meet the needs of the retail market

without changes. *Id.* at 1, ¶ 3 (internal quotation marks omitted). Plaintiffs assert that Mr. Martin testified that "[a]ny retailer considering buying [D&F] for store-level DRP planning, and who asks [Walmart, Lowes, and CVS] how JDA's product is performing, will conclude [s]tore-level DRP planning is expensive, time-consuming, requires more people, takes a long time to implement and in the end produces questionable business results[.]" *Id.* at 3, ¶ 12.

Plaintiffs also contend that JDA failed to develop software to address slow-moving products and to scale to the volumes required for retail planning. Plaintiffs state that until Flowcasting 1.0 entered the market, no one had succeeded in developing DRP software for distribution and planning at the retail store level and that D&F was an old product, which JDA itself recognized needed to be replaced.

The court finds these disputes are not material because Plaintiffs point to no agreement by JDA to develop a product that met with Plaintiffs' specifications or which adopted the Roadmap as a contractual obligation. There is also no provision in the MIPA that requires JDA to use its best efforts to develop software to address slow-moving products or to scale the volume required for retail planning.

## B. Development of Flowcasting.

Plaintiffs dispute JDA's characterization that the Flowcasting software had "seen small updates over time," (Doc. 100-1 at 6, ¶ 28) citing Plaintiff Landvater's testimony in which he stated "[i]n some wa[y]s it[']s quite similar; in some ways it's fairly different." (Doc. 104-1 at 5. ¶ 28) (internal quotation marks omitted) (first alteration in original).

Plaintiffs further assert that when RedPrairie and Plaintiff Retail Pipeline entered the Joint Venture, RedPrairie did so for the purpose of commercializing Flowcasting and Plaintiff Retail Pipeline only agreed to assign Flowcasting technology to the Joint Venture for that purpose. Plaintiffs contend that despite its lack of profit, the Joint Venture had several successful implementations of Flowcasting at national and international companies, including at Kraft/Sam's Club, providing the biggest improvement in forecast accuracy in the history of Kraft; Sony Canada changed from 87% to 95% "in-stock" and "inventory reduced by 26%"; and Princess Auto, where "in-

stock" went from 93% to 96.5% and "inventory reduced by 10%." (Doc. 104-1 at 7,
¶ 44.) The court finds these disputes are not material because they merely provide
divergent views of the value and success of Plaintiffs' Flowcasting intellectual property
when used by the Joint Venture.

## C.    Negotiation of the MIPA.

Plaintiffs challenge JDA's use of the terms "CSPA" or "JDA Flowcasting" and
assert that these are not the same as the product labeled "Flowcasting 2.0" in the MIPA
because Flowcasting 2.0 is defined by the Roadmap. The Roadmap, however, does not
define "Flowcasting 2.0" with any specificity and does not require JDA to develop it. The
MIPA, in turn, does not incorporate the Roadmap or even refer to it. Plaintiffs further
allege that no deal was reached in February 2013 because JDA was required to commit to
the Roadmap before the deal would be finalized. They, however, point to no promise in
the MIPA that requires that commitment.

Plaintiffs dispute JDA's assertions that JDA identified only two aspects of
Flowcasting of interest, citing an email sent by Mr. Johnston to Mr. Brewer:

- Retail Pipeline's positioning, go-to market plan, pricing model, solution
capabilities, and history of working with large retail clients.
- The results from the Kraft pilot implementation in which Kraft Foods
saw early significant improvement in forecasting accuracy from 50% to
70% in-stocks and ongoing value-driven benefits from the "capability to
simulate expected changes and disruptions to everyday replenishment,
such as: new product introductions, promotions, item phase outs,
alternate lead times, alternate shipping lanes, etc.[]"
- Walmart's interest in Flowcasting as a result of the successful Kraft
Foods implementation.
- The efficiency and pricing of the Flowcasting solution.
- JDA's perception that the Joint Venture's go-to market "plan and
positioning is almost identical to [JDA's] plan for CSPA."
- Retail Pipeline's patented software invention for handling slow moving
inventory ("Slow Moving Logic").
- The Flowcasting brand and success where CSPA had failed. (CSPA had
never been sold). Ex. G at 41:17-21.

- The Joint Venture's connections with Walmart.

(Doc. 104-1 at 8-9, ¶ 52.)

JDA states that Flowcasting had "some potential value" as a brand because Mr. Martin had co-authored a book titled "Flowcasting" that "evangelized" the idea of store-level demand forecasts for replenishment. (Doc. 100-1 at 10, ¶ 54.) Plaintiffs counter that Flowcasting had significant potential as a result of Mr. Martin's book as well as the successful implementations of Flowcasting at multiple retailers. Plaintiffs further assert that the following testimony demonstrates that JDA's high-level employees viewed Plaintiff Retail Pipeline's Flowcasting product as a competitor to its own products:

> Q: Did you understand CSPA [and] Flowcasting 1.0 to be competitors at the time, pre-MIPA?
>
> A: **We would have been competitors, Yes.**
>
> Q: Was there an understanding whether or not there would be a production [Flowcasting 1.0] that would be, in a sense, competition with JDA's—
>
> A: Yeah. We knew there was overlap. Yes.
>
> Q: So that was something that was understood?
>
> A: Yes.

*Id.* at 9-10, ¶ 59 (citation omitted) (alterations and emphasis in original). The court finds these disputes immaterial because the outcome of this lawsuit does not depend on whether JDA properly appreciated the value of Plaintiffs' Flowcasting product, whether Plaintiffs' product was superior to JDA's product, or whether the two parties would have been competitors.

Plaintiffs assert that, contrary to JDA's contentions, it was not clear whether JDA wanted to integrate Flowcasting's capabilities as an add-on or "module," citing the following email as an example:

> Perfect outcome from the meeting. I think everyone now understands the expectations moving forward:
> - One system, not two.
> - D&F as the foundation, but open to any significant changes needed to change the current user/workflow paradigms to mask or improve the complexity
>   . . .

- Darryl as a key driver, in collaboration with Dan, in defining any new paradigms.

*Id.* at 13, ¶ 83 (emphasis omitted) (alteration in original). This dispute is not material because in the MIPA, JDA did not promise to integrate Flowcasting's capabilities in any specific manner.

JDA asserts that in July 2013, Mr. Brewer sent an email "putting the issue [of whether JDA should continue using D&F as a software solution for working with retailers] to rest[.]" (Doc. 100-1 at 17, ¶ 86.) Plaintiffs counter that no agreement had been reached so early in the negotiation process and cite an email from December 2013 in which Mr. Johnston informed Mr. Brewer that there was a meeting with Plaintiff Landvater and Mr. Martin set for December 16, 2013 "to agree to the roadmap plan for converging the two products." (Doc. 104-1 at 14, ¶ 86) (internal quotation marks omitted). JDA contends that the December 16, 2013 meeting in Rockville, Maryland was held to discuss the product, whereas Plaintiffs assert that the meeting was specifically held for the parties to reach an agreement on the Roadmap for Flowcasting 2.0. The court finds that these divergent views of the parties' negotiations are not material to interpreting the MIPA.

On December 18, 2013, Daniel Groneck, a JDA employee, sent an email to Mr. Johnston in which he wrote: "We just finished the review of the line items required for Flowcasting 2.0. . . . [Plaintiff Landvater] and [Mr. Martin] are comfortable with this plan." (Doc. 104-1 at 16, ¶ 94) (internal quotation marks omitted). Mr. Groneck testified that JDA did not know at the time whether it would implement the changes discussed during December 16, 2013 meeting and JDA did not know the feasibility or time required to make such changes. Plaintiffs respond that JDA agreed to make the changes documented in the Roadmap and cite an email from Jean-Francois Gagne, the head of JDA Product Management, in which he stated "[w]e will have to get those guys[, Mr. Martin and Plaintiff Landvater,] under control.[] [W]ill let them sign first[.]" *Id.* at 17, ¶ 102.

Plaintiffs offer the following testimony from Fred Baumann to demonstrate that

the Roadmap was the entire agreement between the parties about how to converge

Flowcasting with JDA's products:

> The thing we go to with this convergence is the roadmap as the kind of
> single version of the truth, what we expect to be in the product
> [Flowcasting 2.0], and what we are going to put our development resources
> against. . . . So the roadmap is, you know, of which Darryl [Landvater] had
> a key stake in and voice in…was the definitive version of the truth for what
> we were and what we're not going to do per release cycle.

(Doc. 107-1 at 58) (alterations in original).

Plaintiffs further cite an email which contains, in part, a statement by Plaintiff

Landvater that he could not "hire the number of people needed to make these changes[,]"

(Doc. 104 at 37.) JDA states that Plaintiffs mischaracterize this email exchange between

Plaintiff Landvater and Mr. Baumann, which was sent during the development phase of

the joint product, because although Plaintiff Landvater indicated he did not have enough

employees to implement certain changes, Mr. Baumann responded that he could not

allocate more resources to Flowcasting 2.0 until JDA Flowcasting generated revenue.

JDA further disputes Plaintiffs' assertion that it failed to provide sufficient resources to

Flowcasting 2.0 by pointing out that they spent over \$7,000,000 on Flowcasting

development and marketing during the earn-out period and approximately twenty-eight

developers and a product management team devoted about one year to working on

Flowcasting.

The court finds that none of these disputed facts are material because the MIPA

does not require JDA to employ best efforts to develop or market Plaintiffs' Flowcasting

intellectual property, does not require JDA to use best efforts to develop Flowcasting 2.0

or a similar product, does not require JDA to devote certain resources or employees to

Flowcasting 2.0's development, and does not require JDA to develop a product that

satisfies Plaintiffs' expectations. Plaintiffs executed the MIPA with the knowledge that

Flowcasting 2.0 had not been developed and was not yet on the market. They also

understood that JDA would not commit to developing a product in accordance with their

specifications.

18

## IV.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, not all disputes of fact are material. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The court may grant judgment as a matter of law if the essential elements of a claim have not been established or if a rational fact finder could not find in a party's favor. *See Celotex Corp.*, 477 U.S. at 323 (holding that "[t]he moving party is entitled to a judgment as a matter of law [if] the nonmoving party [fails] to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof") (internal quotation marks omitted); *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (ruling that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial") (internal quotation marks omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

### B.     Choice of Law.

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996). To determine which state substantive law applies, "a federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which that court sits to determine the rules of decision that would apply if the suit were brought in state court." *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013). Here, there is no dispute that Delaware law applies to Counts I and II and Vermont law applies to Counts III and IV.

### C.     Whether JDA is Entitled to Summary Judgment on Plaintiffs' Breach of Contract Claim.

JDA asserts that it is entitled to summary judgment on Plaintiffs' breach of contract claim because there is no evidence that JDA erred in calculating earn-out payments authorized by the MIPA or otherwise denied Plaintiffs compensation due thereunder. Plaintiffs counter that they agreed to sell Flowcasting to JDA on the condition that the parties work together to create, promote, and sell a new combined product that

would be called "Flowcasting 2.0" and that the product would be developed consistent with the Roadmap created by the parties during the December 16, 2013 meeting.

"Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages." *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

> If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. But when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the evidence offered in order to arrive at a proper interpretation of contractual terms.

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (footnotes omitted).

An ambiguity exists "[w]hen the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings[.]" *Id.* "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (internal quotation marks omitted) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

In this case, Plaintiffs argue that JDA breached the MIPA by failing to develop Flowcasting 2.0 and the single reference to the term "Flowcasting 2.0" in the MIPA creates an ambiguity rendering interpretation of the agreement a question of fact for the jury. Use of an undefined term does not alone render the MIPA ambiguous. *See Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 468 n.86 (Del. Ch. 2008) (holding that "ambiguity exists only '[w]hen the words of an agreement are . . . subject to different interpretations and when the words . . . otherwise create ambiguity when viewed in light of other contractual provisions[.]'") (first alteration in original) (quoting *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 1997 WL 525873, at *4 (Del. Ch. Aug. 13, 1997)). The term "Flowcasting 2.0" appears only once in the MIPA under the section

defining the revenue stream and calculation of the earn-out payments and even then, indicates it may be substituted for a "similar product":

> Eligible Revenue:    The earn-out portion of the Purchase Price shall be based on actual recognized (i) software, cloud and maintenance services revenue in excess of the first ten million dollars ($10,000,000) attributable to (a) the Flowcasting 1.0 product including pursuant to existing agreements specifically with Mondelez, Sony Canada and Kraft Foods US, but excluding actual recognized and collected license and subscription revenues (net of internal commissions) prior to and after the commencement of the Earn-Out Period attributable to sales of the Flowcasting 1.0 product to Sigma Company Ltd[.] or Princess Auto (**"Sigma and Princess Revenue"**) that are offset pursuant to Section 2.2. below; (b) the Collaborative Shelf Planning and Analytics (CSPA) solution; and (c) **Flowcasting 2.0 or similar product** (collectively **"Revenue Stream 1"**)[.]

(Doc. 100-15 at 4) (first and third emphasis in original) (second emphasis supplied).

The MIPA contains no provision by JDA to use best efforts to develop Flowcasting 2.0 nor does it set forth any schedule for doing so. Plaintiffs sought to obtain an agreement by JDA to develop a product in accordance with their specifications but failed to do so. They entered into the MIPA knowing it did not contain the provisions they sought. The court cannot rewrite the MIPA to reflect the terms that Plaintiffs requested but failed to obtain through arms-length negotiations. *See Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983) (following "the well-established principle that in construing a contract a court cannot in effect rewrite it or supply omitted provisions"). Although Plaintiffs claim the Roadmap is contractual in nature, not only does it fail to include enforceable provisions, but it was not included in the MIPA. A breach of contact claim cannot be based on a contract term that was proposed but rejected and Plaintiffs point to no provision of the MIPA which JDA breached. *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003) (concluding that to plead a breach of contract claim, a plaintiff must allege "the breach of an obligation imposed by that contract").

Because Plaintiffs fail to identify a disputed issue of material fact with regard to JDA's breach of the MIPA, JDA's motion for summary judgment on Plaintiffs' breach of contract claim (Count I) is GRANTED.

## D.     Whether JDA is Entitled to Summary Judgment on Plaintiffs' Implied Covenant of Good Faith and Fair Dealing Claim.

"Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract." *Chamison v. HealthTrust, Inc. – The Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999). A cause of action based on the implied covenant, however, does not generally allow a court to rewrite the parties' agreement to include terms that favor one party but not the other:

> Delaware observes the well-established general principle that . . . it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement. In cases where obligations can be understood from the text of a written agreement but have nevertheless been omitted in the literal sense, a court's inquiry should focus on "what the parties likely would have done if they had considered the issue involved." In the narrow context governed by principles of good faith and fair dealing, this Court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations. But those cases should be rare and fact-intensive, turning on issues of compelling fairness.

*Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998) (footnotes omitted).

> [T]he legal test for implying contractual obligations was whether it was "*clear* from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith—had they thought to negotiate with respect to that matter."

*Id.* (emphasis in original) (quoting *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986)). "[T]he implied covenant[, however,] is not a license to rewrite contractual language just because the plaintiff failed to negotiate for protections that, in hindsight, would have made the contract a better deal." *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) (first alteration in original).

Plaintiffs argue that JDA failed to develop Flowcasting 2.0 by: (1) refusing to allocate necessary resources to effectuate changes agreed upon in the Roadmap, including

by hiring more employees; (2) moving Plaintiff Landvater from his role in the Product Management Group to a role in which he "would not be in a position to be [a] driving force in the convergence[]"; and (3) terminating Plaintiff Landvater and two "other principal roles" who worked in the Flowcasting group. (Doc. 104 at 38.) The MIPA does not require JDA to develop Flowcasting 2.0 nor does it impose any deadline or best efforts provision for doing so. In recognition of that fact, Plaintiffs successfully negotiated for other streams of revenue for their earn-out compensation. Plaintiffs' breach of the implied covenant of good faith and fair dealing claim is an attempt to rewrite the MIPA to impose new obligations on JDA that Plaintiffs were unable to obtain as a result of arms-length negotiations. Although Plaintiffs argue that JDA thwarted their ability to realize the full earn-out payment because JDA failed to develop Flowcasting 2.0 despite making promises to do so in the Roadmap, they acknowledge that their proposed contractual requirements were rejected, that they signed the MIPA knowing they had been rejected, and that the Roadmap is not even mentioned in the MIPA.

Plaintiffs fail to establish that "the events affecting calculation of the earn-out were developments that could not have been anticipated," *TWA Res. v. Complete Prod. Servs., Inc.*, 2013 WL 1304457, at \*10 (Del. Super. Ct. Mar. 28, 2013), or that JDA "affirmatively act[ed]" in bad faith to gut the revenue generated from the Flowcasting 2.0 project. *Am. Cap. Acquisition Partners, LLC v. LPL Holdings, Inc.*, 2014 WL 354496, at \*7 (Del. Ch. Feb. 3, 2014). Because under Delaware law a court "should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it[,]" *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (internal quotation marks omitted), the court cannot imply in the MIPA an obligation by JDA to develop Flowcasting 2.0 in accordance with Plaintiffs' specifications, to devote certain resources to its development, to hire and retain employees to develop it, or to develop it in accordance with the Roadmap. To do so would be to rewrite the MIPA to Plaintiffs' advantage. JDA's motion for summary judgment on Plaintiffs' implied covenant of good faith and fair dealing claim (Count II) must therefore be GRANTED.

### E.     Whether JDA is Entitled to Summary Judgment on Plaintiffs' Implied Contract Claim.

JDA argues that Plaintiffs may not assert an implied contract claim based on the same conduct covered in an express contract or, in the alternative, that the undisputed evidence does not support the existence of an enforceable implied contract. Plaintiffs counter that JDA "cannot have it both ways" (Doc. 104 at 41) and that if Plaintiffs cannot succeed under a breach of contract theory, JDA's "promise[s] in the Roadmap to take specific steps to create and develop Flowcasting 2.0[]" constitutes an implied contract. (Doc. 104 at 42.) Plaintiffs argue that their implied contract claim is not barred because the MIPA does not contain a merger clause.

> Under Vermont law,

> There are two kinds of implied contracts, as the term is ordinarily used in the books: (1) Where the minds of the parties meet and their meeting results in an unexpressed agreement; (2) where there is no meeting of minds. The former class embraces true contracts which are implied in the sense that the fact of the meeting of minds is inferred. Such contracts are more accurately defined as resting upon an implied promise in fact. The latter class embraces contractual obligations implied by the law where none in fact exist.

*Morse v. Kenney*, 89 A. 865, 866 (Vt. 1914) (citations omitted). An implied-in-fact contract thus requires "a mutual intent to contract." *Id.* at 867. An implied in law contract is another term for unjust enrichment, a claim Plaintiffs do not assert. *See Sweet v. St. Pierre*, 2018 VT 122, ¶ 18, 209 Vt. 1, 10, 201 A.3d 978, 985 (observing that "[a] contract implied in law, or a quasi-contract, is based on an implied promise to pay when a party receives a benefit and the retention of the benefit would be inequitable" and "[l]iability in such cases arises from the doctrine of unjust enrichment") (internal quotation marks omitted).

JDA points out that the Roadmap is nothing more than an email compiling notes from a meeting and does not reflect a mutual intent to be bound to develop specific product features. Plaintiffs counter that JDA knew that the only way Plaintiffs would agree to the MIPA was by making promises in the Roadmap and that a JDA representative observed: "the roadmap is what's blocking the deal to get through[.] We

25

really need to get [Plaintiff Landvater] comfortable with the [convergence] plan quickly[.]" (Doc. 104 at 44) (internal quotation marks omitted) (third alteration in original). Plaintiffs further cite Mr. Baumann's testimony that the Roadmap was:

> the kind of single version of the truth, what we expect to be in the product [Flowcasting 2.0], and what we are going to put our development resources against[.] So the roadmap is, you know, of which [Plaintiff Landvater] had a key stake in and voice in . . . was the definitive version of the truth for what we were and what we're not going to do per release cycle.

*Id.*

After extensive contractual negotiations for the MIPA, Mr. Martin testified that Plaintiffs tried and failed to obtain certain contractual terms in the MIPA which would have required development of Flowcasting 2.0 and that he was aware that JDA would not tie its product strategy to Plaintiffs' expectations. Plaintiffs cite no promise by JDA to follow the Roadmap in any subsequent product development, nor is the Roadmap mentioned in the parties' agreement. The Roadmap itself is nothing more than "rough notes" of a brainstorming session regarding future collaborations. Plaintiffs point to no promises set forth therein. The parties subsequently reduced their agreement to writing in the MIPA which does not even mention the Roadmap, much less incorporate it therein. Plaintiffs signed the MIPA without obtaining the promises they now seek to enforce. Against this backdrop, even in the light most favorable to Plaintiffs, the undisputed facts reveal that Plaintiffs have failed to establish an implied contract to follow the Roadmap supported by mutual assent. As a result, JDA's motion for summary judgment on Plaintiffs' implied contract claim (Count III) is GRANTED.

### F.   Whether JDA is Entitled to Summary Judgment on Plaintiffs' Constructive Fraud Claim.

JDA argues that Plaintiffs' constructive fraud claim must fail for two reasons: (1) Plaintiffs seek relief not available under constructive fraud and (2) JDA's alleged promises cannot form the basis for a constructive fraud claim as a matter of law.

Fraud requires: "(1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party act[ed] in reliance on that fact; and (5) is thereby harmed."

*Est. of Alden v. Dee*, 2011 VT 64, ¶ 32, 190 Vt. 401, 416, 35 A.3d 950, 960-61. The Vermont Supreme Court has held that "[w]here there is no intent to mislead or defraud, but the other elements of fraud are met," a defendant may be liable for constructive fraud. *Sugarline Assocs. v. Alpen Assocs.*, 586 A.2d 1115, 1120 (Vt. 1990). Constructive fraud "may be found in cases involving misrepresentations that do not rise to the level of deceit, or actual fraud, and in cases where a party in a position of superior knowledge or influence intentionally gains an unfair advantage at the expense of another person." *Hardwick-Morrison Co. v. Albertsson*, 605 A.2d 529, 531 (Vt. 1992) (citation omitted).

"The law[] . . . recognizes a distinction between the strict elements of an action for fraud and deceit, and the constructively fraudulent misrepresentations, made negligently or innocently, which may provide grounds for a rescission of an agreement in equity." *Union Bank v Jones*, 411 A.2d 1338, 1342 (Vt. 1980). "Constructive fraud is an equitable claim that *typically* has not afforded relief in the form of monetary damages." *Hardwick-Morrison Co.*, 605 A.2d at 532 (emphasis supplied); *see also Vt. Plastics, Inc. v. Brine, Inc.*, 824 F. Supp. 444, 452 n.10 (D. Vt. 1993), *aff'd*, 79 F.3d 272 (2d Cir. 1996) ("When a plaintiff chooses to proceed in equity under a constructive fraud claim, . . . the plaintiff is limited to re[s]cis[s]ion, an equitable remedy, and may not recover damages."). Although JDA contends that Vermont law prohibits monetary damages for constructive fraud, the Vermont Supreme Court has not adopted a per se rule. *See Mount Snow, Ltd. v. Alli*, 2012 WL 1957560, at *4 (D. Vt. May 30, 2012) (concluding that "[w]ithout raising the concern over the economic loss doctrine, at least one Vermont Court has granted damages for economic losses in a constructive fraud case") (citing *Hardwick-Morrison Co.*, 605 A.2d 529).[3] Plaintiffs do not, however, seek rescission and have made no tender

---

[3] Plaintiffs cite one nonprecedential case for the proposition that the merger of courts of law and equity makes monetary damages available in constructive fraud claims. *See Mayor's Jewelers, Inc. v. Meyrowitz*, 2012 WL 2344609, at *8 (S.D. Fla. June 20, 2012) (observing that a case holding that rescission is the only remedy for constructive fraud "was decided before the merger of courts of equity and law. More recent case law does not support [d]efendants' argument that rescission is the sole remedy for constructive fraud") (citation omitted).

of earn-out consideration to JDA in exchange for a return of their Flowcasting intellectual property.

Even if monetary damages are available under Vermont law for constructive fraud, JDA asserts that Plaintiffs' claim would fail because it is based on Plaintiffs' claim that "JDA is liable to Plaintiffs for breaking its word and failing to develop Flowcasting 2.0," (Doc. 104 at 46) when Plaintiffs identify no such promise. Moreover, Plaintiffs make no claim that JDA occupied a position of superior knowledge whereby it gained an unfair advantage.

Although "misrepresentations about future actions can be fraudulent if defendant, at the time of the statement, intends to act differently from the promise[,]" *Winey v. William E. Dailey, Inc.*, 636 A.2d 744, 747 (Vt. 1993), in a constructive fraud claim "mere promises to act in the future cannot constitute the requisite misrepresentation of existing fact that is essential to fraud[]" because "in the case of a negligent or innocent future promise, there is no present intention to act contrary to the promise, and therefore there can be no misrepresentation of existing fact." *Union Bank*, 411 A.2d at 1342. In this case, Plaintiffs assert JDA fraudulently induced them to enter the MIPA by "misrepresent[ing] its commitment to work with Plaintiffs to develop Flowcasting 2.0." (Doc. 104 at 46.) Plaintiffs, however, admit that they sought to include this commitment as a contractual obligation in the MIPA and failed. They were thus, by their own admissions, not defrauded but were merely unsuccessful in their contractual negotiations. They point to no misrepresentations that were not open to their knowledge that they reasonably relied upon to their detriment.

Because Plaintiffs' constructive fraud claim allegations are not based on a "misrepresentation of existing fact[,]" *Union Bank*, 411 A.2d at 1342, and because the other elements of a constructive fraud claim have not been established, summary judgment on Plaintiffs' constructive fraud claim is appropriate. *See Celotex Corp.*, 477 U.S. at 323 ("The moving party is 'entitled to a judgment as a matter of law' [where] the nonmoving party has failed to make a sufficient showing on an essential element of her

case with respect to which she has the burden of proof."). JDA's motion for summary judgment on Plaintiffs' constructive fraud claim (Count IV) is therefore GRANTED.

## CONCLUSION

For the foregoing reasons, the court GRANTS JDA's motion for summary judgment and GRANTS IN PART Plaintiffs' motion to strike. (Docs. 100 & 108.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 31st day of August, 2021.

Christina Reiss, District Judge
United States District Court